371 F.3d 1137
 RUI ONE CORPORATION, a Washington corporation, Plaintiff-Appellant,
v.
CITY OF BERKELEY, Defendant-Appellee,
Hotel Employees & Restaurant Employees Union Local 2850, Defendant-Intervenor-Appellee.
 No. 02-15762.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted June 11, 2003.
 Filed June 16, 2004.
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED R. Zachary Wasserman, Wendel, Rosen, Black & Dean, LLP, Oakland, CA, for the plaintiff-appellant.
 Manuela Albuquerque, City Attorney, Berkeley, CA, for the defendant-appellee.
 Andrew J. Kahn, Davis, Cowell & Bowe, LLP, San Francisco, CA, for the defendant-intervenor-appellee.
 Paul K. Sonn, Brennan Center for Justice, New York, NY, for the amici curiae.
 Appeal from the United States District Court for the Northern District of California; Susan Yvonne Illston, District Judge, Presiding. D.C. No. CV-00-03878-SI.
 Before GRABER, WARDLAW, and BYBEE, Circuit Judges.
 Opinion by Judge Wardlaw; Dissent by Judge Bybee
 WARDLAW, Circuit Judge:
 
 
 1
 As the cost of living skyrockets around the country, and in the San Francisco Bay Area in particular, the face of American poverty is changing dramatically. More and more frequently, full-time, minimum-wage workers are unable to support their families' basic needs. See Jim Newton, L.A.'s Growing Pay Gap Looms as Political Issue Poverty, L.A. Times, Sept. 7, 1999, at A1 ("Today's poverty icon is a working mother, toiling eight hours or more a day at a job that does not pay enough to cover the rent, clothe the baby or provide a life of even minimal comfort."). Recognizing the plight of its own working poor, the City of Berkeley, California, has joined dozens of other cities nationwide to help bridge the gap between federal and state laws setting the minimum wage — the real value of which has decreased over the past few decades — and the costs of modern urban living by enacting "living wage" ordinances. These ordinances require certain employers to pay their employees wages approximating the real cost of living in the locality, which is often significantly higher than the applicable state or federal minimum wage. Although these ordinances routinely exempt smaller or less profitable employers from their coverage, they do increase labor costs for affected employers.
 
 
 2
 We must decide whether Berkeley's Living Wage Ordinance, Berkeley Ordinance No. 6548-N.S. (2000) (creating Berkeley Municipal Code ch. 13.27), amended by Berkeley Ordinance No. 6583-N.S. (2000) ("Marina Amendment"), violates the Contract Clause of the United States Constitution, the Equal Protection Clause of the United States and California Constitutions, or the state and federal Due Process Clauses as an impermissible delegation of legislative power to unions. Reviewing the constitutionality of the local ordinance de novo, see 4805 Convoy, Inc. v. City of San Diego, 183 F.3d 1108, 1113 (9th Cir.1999), we hold that Berkeley's Living Wage Ordinance, as amended, survives these constitutional challenges. Accordingly, we affirm the decision of the district court denying RUI One Corporation's ("RUI") summary judgment motion and entering judgment in favor of the City of Berkeley.
 
 I.
 
 3
 A. Minimum Wage Laws and Living Wage Ordinances
 
 
 4
 Minimum wage legislation was introduced into the American legal scene early in the twentieth century, as part of broader efforts to improve working conditions and regulate the employment of vulnerable groups (e.g., recent immigrants, women, and children). See generally William P. Quigley, `A Fair Day's Pay For a Fair Day's Work': Time to Raise and Index the Minimum Wage, 27 St. Mary's L.J. 513, 515-29 (1996); see also id. at 516 (noting California's 1913 minimum wage statute). Although the United States Supreme Court struck down some of the earliest minimum wage statutes under its now-defunct economic due process analysis, e.g., Adkins v. Children's Hosp., 261 U.S. 525, 43 S.Ct. 394, 67 L.Ed. 785 (1923) (minimum wages for women and children in particular industries in Washington, D.C.), it eventually upheld their validity in West Coast Hotel Co. v. Parrish, 300 U.S. 379, 57 S.Ct. 578, 81 L.Ed. 703 (1937) (upholding State of Washington's women and minors minimum wage statute), a case now viewed as the death knell of heightened constitutional scrutiny for economic legislation.
 
 
 5
 The federal government joined in this growing effort, at first unsuccessfully with the National Industrial Recovery Act in 1933, but finally in 1938 with the enactment of the Fair Labor Standards Act, 29 U.S.C. §§ 201-219 ("FLSA"). See Quigley, supra, at 521-29. The FLSA explicitly recognized that in setting national minimum wages in certain industries, it did not intend to usurp the power of states and municipalities to set higher minimum wages, or to set minimum wages in industries not targeted in the FLSA. See 29 U.S.C. § 218(a) ("No provision of this chapter or of any order thereunder shall excuse noncompliance with any Federal or State law or municipal ordinance establishing a minimum wage higher than the minimum wage established under this chapter....").
 
 
 6
 Since its enactment, eleven states, including in this Circuit Alaska, California, Hawaii, Oregon, and Washington, have enacted minimum wage laws setting statewide wages above the federal minimum. See United States Dep't of Labor, Minimum Wage Laws in the States.[1] Like their federal counterpart, however, these statewide laws contain exemptions for certain industries. See id. n. 1. Of significance to the question before us, several of these state laws expressly contemplated further wage regulation by individual localities, including in California, whose state constitution grants municipalities broad legislative power. See Cal. Const. art. XI, § 7; Cal. Lab.Code § 1205(b) ("Nothing in this part shall be deemed to restrict the exercise of local police powers in a more stringent manner.").
 
 
 7
 In the 1960s, certain municipalities, including Baltimore, New York City, and Washington, D.C., began enacting minimum wage ordinances, often preceding statewide legislative action. See McMillen v. Browne, 14 N.Y.2d 326, 251 N.Y.S.2d 641, 200 N.E.2d 546 (1964) (upholding New York City ordinance); Mayor of Baltimore v. Sitnick, 254 Md. 303, 255 A.2d 376 (1969) (Baltimore); D.C.Code Ann. §§ 32-1001 to -1015. More recently, localities around the country, beginning with Baltimore in mid-1996, have begun refocusing their efforts to enact new ordinances, setting wages and employee benefits higher than either federal or state minimums. Localities in California joined this trend within a few years. Currently, such measures are in place in several counties, including Los Angeles, Ventura, and Marin, as well as a number of municipalities, including San Francisco, Pasadena, San Jose, Santa Cruz, Oakland, and, of course, Berkeley.
 
 
 8
 Unlike their state and federal counterparts, local wage ordinances tend to be more restrictive in scope; rather than setting citywide minimums applicable to all employers, public and private, most cities have chosen a piecemeal approach, targeting only recipients of city contracts or lessees or larger businesses with more employees and higher earnings. See Santa Monica, Calif., Adopts First `Living Wage' Law, Wall St. J., July 26, 2001, at B4 (noting that, unlike most cities, Santa Monica adopted an ordinance targeting certain private employers regardless of city contracts); see also Martha Groves, Backers of Failed `Living Wage' Vow to Press On, L.A. Times, Nov. 7, 2002, § 2, at 10 (Santa Monica's ordinance repealed in 2002 via voter initiative). These local ordinances also differ from their federal and state counterparts in that they mandate significantly higher wages and employee benefits from governed employers. See id. (noting that Santa Monica's measure would have required businesses to pay employees $10.50 an hour with health benefits or $12.25 without). Their proponents' goals are to allow covered full-time wage-earners to support a family residing in the locality at a subsistence level; it is for this reason that such ordinances are often referred to as "living wage ordinances," rather than "minimum wage ordinances." See ACORN Living Wage Resource Ctr., Setting a Living Wage Level.[2]
 
 
 9
 In part, this rising tide of state and local legislation has developed due to the decline in the real value of both federal and state minimum wages, which have not risen along with inflation or the cost of living. Compare United States Dep't of Labor, Chart of Minimum Wage Values in Constant Dollars[3] (noting that if the 1968 minimum wage of $1.60 per hour had kept up with inflation, it would be worth approximately $8.00 per hour in 1996 dollars), with 29 U.S.C. § 206(a)(1) (current federal minimum wage is $5.15 per hour). States, too, have recently refocused their efforts on the working poor, e.g., Cal.Code Regs. tit. 8, § 11000(2) (raising California's minimum wage to $6.25 per hour in 2001, and to $6.75 per hour, effective January 1, 2002), but have not been able to bridge the gap between the realities of statewide legislation and the high cost of living in certain localities, see Heather Boushey et al., Hardships in America: The Real Story of Working Families 73 tbl. A4.1 (Econ. Policy Inst.2001) (estimating the annual subsistence cost of living in San Francisco as $38,431, or $18.47 per hour for full-time employees, and in Oakland as $31,848, or $15.31 per hour).[4] It is against this backdrop that many localities in California and nationwide have enacted living wage ordinances.
 
 B. The Berkeley Living Wage Ordinance
 
 10
 The City of Berkeley enacted its living wage ordinance on June 27, 2000. See Berkeley Ordinance No. 6548-N.S. (2000). The ordinance mandated minimum hourly wages and employee benefits for certain employers that received some form of financial benefit from the City (e.g., City contract awardees, lessees of City property, City financial aid recipients), and that meet specified criteria (i.e., number of employees, annual revenues). See id. § 2 (creating Berkeley Municipal Code § 13.27.030).
 
 
 11
 Accompanying the ordinance were the City Council's findings explaining the reasoning behind the ordinance. The Council expressed its concern that "far too many people working in Berkeley ... live below or near the poverty line" and that, therefore, "the privilege of using public property to operate a business enterprise should not be granted to parties that will exacerbate the problems associated with inadequate compensation of workers." See id. § 1(d), (g). It further found that the absence of employer-sponsored health insurance plans ultimately results in higher healthcare costs for the City, state, and federal governments. See id. § 1(I). Therefore, the City mandated that employers meeting the relevant criteria be required to pay their employees a minimum of $9.75 per hour, unless they do not provide their employees with health benefits, in which case they must pay them a minimum of $11.37 per hour. See id. § 2 (creating Berkeley Municipal Code § 13.27.050(A)).
 
 
 12
 The minimum wages exceeded then and now both the federal and state minimum wage requirements. At the time of the ordinance's enactment, federal law required a minimum wage of $5.15 per hour, 29 U.S.C. § 206(a)(1), and California law required a minimum wage of $5.75 per hour. Since its enactment, California has raised its minimum wage to $6.25 per hour in 2001, and most recently to $6.75 per hour, effective January 1, 2002. Cal.Code Regs. tit. 8, § 11000(2).
 
 
 13
 The Ordinance requires employers to provide their employees a minimum of 22 days off per year for vacation, sick leave, or personal necessity, of which at least 12 days were to be paid. See Living Wage Ordinance § 2 (creating Berkeley Municipal Code § 13.27.050(B)). It also requires that a provision mandating compliance with its terms be included in every new or amended City contract or lease. See id. (creating Berkeley Municipal Code § 13.27.060). It includes a mechanism for receiving employee complaints and a private right of action for employees in county and state courts. See id. (creating Berkeley Municipal Code §§ 13.27.090-.100).
 
 
 14
 Before enacting the living wage ordinance, the City commissioned a feasibility and cost study. The study concluded that the cost of the ordinance on City lessees could be borne in three ways, by: (1) the City, in the form of lower lease revenue upon renegotiation of the leases; (2) the affected employers, in the form of reduced profits; and/or (3) consumers who purchase products or services from the affected businesses, in the form of higher prices. Although all three of these cost-bearing mechanisms would likely be implicated, it was impossible to conclude what the "split" among them would be. Id. The study's authors apparently assumed that the living wage ordinance would be implemented for City lessees only upon the renegotiation of their lease contracts.
 
 C. The Marina Amendment
 
 15
 In the latter part of the 19th century, the state Board of Tide Land Commissioners granted tidelands in San Francisco Bay to private parties free of public trust. See City of Berkeley v. Superior Court, 26 Cal.3d 515, 162 Cal.Rptr. 327, 606 P.2d 362, 363 (1980). Through careful and stringent land use regulation, the City of Berkeley attempted to ensure that this then-private land would retain its environmental and open space character.
 
 
 16
 In 1913, the State of California granted 4,388 acres of tidelands to the City of Berkeley to be held in a public trust. See Act of June 11, 1913, ch. 347, 1913 Cal. Stat. 45, amended by Act of Apr. 24, 1962, ch. 55, 1962 Cal. Stat. 343. The grant provided that these lands be used only for purposes consistent with the trust, including promoting public access to and enjoyment of the waterfront as a natural resource and place of recreation. City of Berkeley, 162 Cal.Rptr. 327, 606 P.2d at 365.
 
 
 17
 After numerous attempts in court by the State of California and the City of Berkeley to declare that the private land was impressed with the public trust, the City eventually persuaded the State to acquire the land and combine it with the public trust lands to form Eastshore State Park. Thus, the Marina is held in the public trust by the City as trustee.[5]
 
 
 18
 In the 1960s, the City abandoned a proposal to turn the site into an industrial area and garbage dump, and decided instead to create a marina and recreation area. Over the past several decades, the City has invested tens of millions of dollars improving the marina area, building public facilities, and creating open spaces, as well as encouraging the public to enjoy these facilities by sponsoring programs and special events. The City also leased some of the land to private entities, such as RUI's predecessor in interest, to operate businesses thereon. Since 1987, however, the City has imposed a moratorium on commercial development in the Marina.
 
 
 19
 On September 19, 2000, Berkeley's city council amended the living wage ordinance to also cover certain employers in the Berkeley Marina. See Berkeley Ordinance No. 6583-N.S. (2000) (amending Berkeley Municipal Code ch. 13.27). The Marina Amendment defines the Marina as "all land held in trust by the City of Berkeley." Id. The amendment added "[e]ntities within the boundaries of the Marina Zone which employ six (6) or more employees and generate $350,000 or more in annual gross receipts," to the list of employers required to comply with the minimum wage, leave, and health benefit provisions of the living wage ordinance. See id. § 2 (amending Berkeley Municipal Code § 13.27.030). The amendment requires such Marina employers to provide their employees with the higher wages and improved benefits effective immediately, rather than upon the signing of a new lease contract with the City incorporating its terms.[6] The Marina Amendment also encompasses businesses that are not City lessees, including for example mobile food-service vendors or water-based services (e.g., charter boats), and which therefore would not have been covered under the original Living Wage Ordinance.
 
 
 20
 The amendment was accompanied by City Council findings that: (1) the public interest is served by requiring large Marina employers to pay their employees a living wage because operating a business in the public trust land of the Marina is a privilege, which should not be abused by contributing to the problems associated with inadequate compensation of workers; (2) the City expends considerable resources in maintaining and promoting the Marina, in turn affording Marina businesses significant financial benefits, a reasonable portion of which should be used to provide employees with appropriate wages and benefits; and (3) members of the public who visit the Marina have a limited choice of businesses to patronize in that area, and should not be deterred from visiting the Marina because they do not wish to patronize businesses that do not provide their employees a living wage.[7] Id. § 1.
 
 D. The RUI Lease
 
 21
 On March 23, 1968, RUI's predecessor in interest, Manning's, Inc., entered into a fifty-year lease (expiring in 2018) with the City for land located on the public-trust tidelands in the Berkeley Marina. The lease agreement required the lessee to "construct, maintain and operate thereon a major first-class restaurant and cocktail lounge for the convenience and promotion of commerce, navigation and fishery in the Berkeley Marina and for no other purpose." The annual rent due the City was the greater of $11,400 or 2.5% of the restaurant's gross receipts (i.e., before the restaurant deducts operating expenses and labor costs). The lease also contained a number of specific provisions, including provisions requiring the lessee to charge its customers reasonable rates consistent with similar establishments in the San Francisco Bay area (the "reasonable rate requirement") and to "employ its best judgment, efforts and abilities" to maximize profits and enhance the reputation of the Berkeley Marina.
 
 
 22
 The lease was assigned via an intermediary to the Kries-Grundy Corporation in 1969. In turn, the property was subleased by Berkeley Marina Associates, who in turn subleased it to Restaurants Unlimited, Inc. In August of 1996, Restaurants Unlimited, Inc., assigned the lease to its subsidiary, RUI One Corp. The assignment agreement increased the rent for the leased property to 3.0% of the restaurant's gross receipts until June 30, 2007, and 3.3% of the gross receipts thereafter until the end of the lease term in 2018. The lessee also agreed to install a "grease trap" in the restaurant, which according to a letter from the Berkeley City Manager would cost approximately $50,000. At the time of the lease renegotiation, neither the Living Wage Ordinance nor the Marina Amendment had yet been enacted.
 
 E. Procedural History
 
 23
 On October 19, 2000, RUI filed a complaint for declaratory and injunctive relief against the City in the Northern District of California, alleging that the Living Wage Ordinance and Marina Amendment violate the Contract Clause, Equal Protection Clause, and Due Process Clause. Over one year later, the district court permitted the Hotel Employees & Restaurant Employees Union, Local 2850, to intervene on behalf of the City. RUI subsequently moved for summary judgment, alleging inter alia that the Marina Amendment was unconstitutional. The district court sua sponte granted summary judgment to the City and Local 2850, holding that the ordinance was not unconstitutional. The parties stipulated to judgment, and this appeal followed.
 
 II.
 
 24
 "No State shall ... pass any ... Law impairing the Obligation of Contracts." United States Const. art. I, § 10, cl. 1. Although the text of the Contract Clause is "facially absolute," the Supreme Court has long held that "its prohibition must be accommodated to the inherent police power of the State `to safeguard the vital interests of its people.'" Energy Reserves Group, Inc. v. Kan. Power & Light Co., 459 U.S. 400, 410, 103 S.Ct. 697, 74 L.Ed.2d 569 (1983) (quoting Home Bldg. & Loan Ass'n v. Blaisdell, 290 U.S. 398, 434, 54 S.Ct. 231, 78 L.Ed. 413 (1934)).
 
 
 25
 Whether a regulation violates the Contract Clause is governed by a three-step inquiry: "The threshold inquiry is `whether the state law has, in fact, operated as a substantial impairment of a contractual relationship.'" Id. at 411, 54 S.Ct. 231 (quoting Allied Structural Steel Co. v. Spannaus, 438 U.S. 234, 244, 98 S.Ct. 2716, 57 L.Ed.2d 727 (1978)). If this threshold inquiry is met, the court must inquire whether "the State, in justification, [has] a significant and legitimate public purpose behind the regulation, such as the remedying of a broad and general social or economic problem," to guarantee that "the State is exercising its police power, rather than providing a benefit to special interests." Id. at 411-12, 54 S.Ct. 231 (citation omitted). Finally, the court must inquire "whether the adjustment of `the rights and responsibilities of contracting parties is based upon reasonable conditions and is of a character appropriate to the public purpose justifying the legislation's adoption.'" Id. at 412-13, 54 S.Ct. 231 (quoting United States Trust Co. v. New Jersey, 431 U.S. 1, 22, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977)). "Unless the State itself is a contracting party, `as is customary in reviewing economic and social regulation, ... courts properly defer to legislative judgment as to the necessity and reasonableness of a particular measure.'" Id. at 412-13, 54 S.Ct. 231 (quoting United States Trust Co., 431 U.S. at 22-23, 97 S.Ct. 1505) (footnote omitted). Courts defer to a lesser degree when the State is a party to the contract because "the State's self-interest is at stake." United States Trust Co., 431 U.S. at 25-26, 97 S.Ct. 1505.
 
 
 26
 The threshold inquiry — whether the state law "has `operated as a substantial impairment of a contractual relationship'" — itself has three components: "whether there is a contractual relationship, whether a change in law impairs that contractual relationship, and whether the impairment is substantial." Gen. Motors Corp. v. Romein, 503 U.S. 181, 186, 112 S.Ct. 1105, 117 L.Ed.2d 328 (1992) (quoting Allied Structural Steel Co., 438 U.S. at 244, 98 S.Ct. 2716). The first sub-inquiry is not whether any contractual relationship whatsoever exists between the parties, but whether there was a "contractual agreement regarding the specific ... terms allegedly at issue." Id. at 187, 112 S.Ct. 1105. It is at this initial phase of the analysis that RUI's claim, like General Motors's claim in Romein, fails.
 
 
 27
 RUI contracted with Berkeley to lease land and operate a restaurant on it. As the dissent acknowledges, post, at 1160-61, no specific provision of the lease agreement addresses payment to or employment benefits for RUI's employees. Similarly, in Romein, General Motors challenged the effect of a Michigan workers' compensation statute on its employee contracts. Id. at 187, 112 S.Ct. 1105. The employment contracts, however, "ma[d]e no express mention of workers' compensation benefits," and thus the Supreme Court concluded there was no need to address whether there was a substantial impairment. Id. at 187-88, 112 S.Ct. 1105.
 
 
 28
 RUI makes four ultimately unpersuasive arguments in an effort to overcome the Supreme Court's controlling contractual relationship analysis in Romein.
 
 
 29
 A. No specific terms of the lease agreement are impaired by the Marina Amendment.
 
 
 30
 First, acknowledging that Romein controls our decision, RUI argues that the Marina Amendment in fact impairs three specific provisions of the lease agreement: (1) the setting of the annual rent in terms of the restaurant's gross profits (excluding operating and labor costs); (2) the reasonable rate requirement; and (3) the requirement that RUI use its best judgment in managing the restaurant to maximize profits and enhance the reputation of the Berkeley Marina. This argument fails because none of these provisions specifically addresses the wages and benefits that RUI must pay its employees. Moreover, RUI glosses over the fact that the rent provision, calculating rent as a percentage of gross receipts, before labor costs are deducted, is not affected by increased wage and benefit costs. Nor does the Marina Amendment affect directly the rates RUI charges or RUI's best judgment. The latter two remain entirely within RUI's control.
 
 
 31
 B. No "implied" terms of the lease agreement are impaired by the Marina Amendment.
 
 
 32
 RUI next argues that the Marina Amendment impairs an implied term of the lease agreement. Because the lease agreement contains an integration clause, the lease represents the parties' entire agreement, and there can be no implied terms. The dissent turns this tenet of contract law on its head by insisting that the absence of a specific term as to employee wages and benefits means the parties actually agreed to incorporate RUI's existing pay scale as part of the lease agreement. RUI's then existing pay scale plainly was not a part of the lease agreement and, more importantly, California law precludes this implication. See California Practice Guide: Civil Trials and Evidence § 8:3087 (2003) ("An integration clause is an express statement that all prior discussions are superseded by (or `merged' into) the written agreement."). Thus, any agreements between Berkeley and RUI that were not expressed in the written agreement were presumptively superseded by the written agreement. The dissent's insistence that "silence in this integrated lease contract represents Berkeley's agreement not to interfere in RUI's wage setting," post, at 1162, presumably by not passing laws governing wages and benefits, is illogical and without legal support.
 
 
 33
 While California law will imply non-essential terms, "those implied rights must be closely connected to the express provisions of the contract." McMillin Scripps N. P'ship v. Royal Ins. Co. of Am., 19 Cal.App.4th 1215, 1220, 23 Cal.Rptr.2d 243 (Ct.App.1993). Most damaging to RUI's claim is that the agreement in question is a commercial lease. Employee wages and benefits are not closely connected to the express provisions of the lease agreement and a city's agreement not to adjust wages and benefits would clearly be an essential term that must be expressed.
 
 
 34
 As for the more specific circumstance of a Contract Clause claim, the Romein Court recognized that implied contractual terms can form the basis for a Contract Clause claim, but that "the contracting parties [must] ... manifest[] assent" to such a term, and that such a term must be "so central to the bargained-for exchange between the parties, or to the enforceability of the contract as a whole, that it must be deemed to be a term of the contract." Id. at 188-89, 112 S.Ct. 1105. RUI neither explains what the implied contract term is, nor shows how Berkeley manifested its assent to that term, nor demonstrates why any such term would be "central to the bargained-for exchange."
 
 
 35
 In contrast, we have found state statutes and municipal ordinances to impair implied contractual terms substantially when such terms were clearly part of the bargained-for agreement. In University of Hawaii Professional Assembly v. Cayetano, for example, Hawaii enacted a "pay lag" statute, authorizing the State unilaterally to postpone the dates on which state employees received their salaries. 183 F.3d 1096, 1099 (9th Cir.1999). Even though the employees' collective bargaining contract with the state did not contain an explicit term requiring specific payroll dates, we found that twenty-five years of payments on the fifteenth and last days of each month amounted to a "course of dealing," creating an enforceable contractual expectation under Hawaii contract law. Id. at 1102.
 
 
 36
 More recently, we found that the City of Santa Ana's 2001 ordinance imposing a trench-cutting fee substantially interfered with a local utility's right under a 1938 franchise, allowing it to lay pipes under city streets in exchange for a percentage of the utility's profits. See Southern California Gas v. City of Santa Ana, 336 F.3d 885, 890 (9th Cir.2003) (per curiam). Although the 1938 contract did not specifically forbid the city from imposing such fees, we noted that a fair reading of its terms, coupled with years of past practice, conferred on the utility a right to excavate below city streets and repair any damage it creates in the process — and that the city's bald attempt to increase its revenue by imposing an additional "direct, immediate and measurable[cost, which] affects a central provision of the franchise" was therefore unconstitutional. Id. at 892.
 
 
 37
 RUI has failed to identify any specific implied contractual right it enjoys as a result of its lease agreement with the City that is impaired, substantially or not, by the Marina Amendment. Moreover, to the extent that RUI contends that the lease agreement contains an implied term providing that the City would not enact any ordinances imposing an economic burden upon RUI during the period of the lease, such a contractual term would be void as against public policy. For "`the legislature cannot bargain away the police power of a State.' ... [T]he Contract Clause does not require a State to adhere to a contract that surrenders an essential attribute of its sovereignty." United States Trust, 431 U.S. at 23, 97 S.Ct. 1505 (quoting Stone v. Mississippi, 101 U.S. 814, 817, 25 L.Ed. 1079 (1880)).
 
 
 38
 Otherwise, one would be able to obtain immunity from the state regulation by making private contractual arrangements.... [As] summarized in Mr. Justice Holmes' well-known dictum: `One whose rights, such as they are, are subject to state restriction, cannot remove them from the power of the State by making a contract about them.'
 
 
 39
 See id. at 22, 97 S.Ct. 1505 (quoting Hudson County Water Co. v. McCarter, 209 U.S. 349, 357, 28 S.Ct. 529, 52 L.Ed. 828 (1908)); see also Avco Cmty. Developers, Inc. v. S. Coast Reg'l Comm'n, 17 Cal.3d 785, 800, 132 Cal.Rptr. 386, 553 P.2d 546 (1976) ("[I]t is settled that the government may not contract away its right to exercise the police power in the future.").[8]
 
 
 40
 The power to regulate wages and employment conditions lies clearly within a state's or a municipality's police power." `States possess broad authority under their police powers to regulate the employment relationship to protect workers within the State. Child labor laws, minimum and other wage laws, laws affecting occupational health and safety ... are only a few examples.'" Metro. Life Ins. Co. v. Massachusetts, 471 U.S. 724, 756, 105 S.Ct. 2380, 85 L.Ed.2d 728 (1985) (quoting DeCanas v. Bica, 424 U.S. 351, 356, 96 S.Ct. 933, 47 L.Ed.2d 43 (1976)).
 
 
 41
 Moreover, the lease agreement contains a provision mandating that RUI "comply with all applicable laws, ordinance[s] and regulations of the City [of Berkeley], County, State and United States Governments." California courts have consistently interpreted such provisions to mean that a party to a contract will "comply with existing as well as future law." Marina Plaza v. Cal. Coastal Zone Conservation Comm'n, 73 Cal.App.3d 311, 140 Cal.Rptr. 725, 732 (1977); accord Hermosa Beach Stop Oil Coalition v. City of Hermosa Beach, 86 Cal.App.4th 534, 103 Cal.Rptr.2d 447, 463 (2001). Thus, contrary to RUI's suggestion, the lease agreement provides that RUI will be subject to regulation that may change with time, not that it is immune from such regulation.
 
 
 42
 Flying in the face of this express "compliance with law" lease term, the dissent makes the hyperbolic argument that there was no reason for RUI to specifically negotiate an exemption from future increases in the minimum wage because RUI could not have anticipated that the City would "effectively rewr[i]te RUI's lease by ordinance." Post, at 1163. In support, it asserts that "[t]he Contract Clause protects parties doing business with the government from such arbitrary exercises of sovereign authority," and then offers a lengthy string cite of cases it represents exemplify "such arbitrary exercises of sovereign authority." Post, at 1163. None of these cases supports the assertion that the Marina Amendment is such an "arbitrary exercise[] of sovereign authority."[9] In each cited case (except University of Hawaii, discussed in detail supra p. 1148-49), the newly enacted ordinance directly affected a specific, express term in the government contract.[10]
 
 
 43
 For example, in Air Cal, Inc. v. City & County of San Francisco, we held that a wage condition in a municipal ordinance impaired the private airlines' leases with the City. 865 F.2d 1112, 1116 (9th Cir.1989). However, the written leases gave the airlines the right to "hire and train" employees. We reasoned that "the ordinary meaning of the term `to hire' commonly includes both a `selection' and `payment' component." Id. at 1115. Therefore, the leases expressly contemplated how the airlines would treat employee's wages and benefits, and the ordinance clearly impaired that specific provision, as in Romein.
 
 
 44
 C. No "expected benefits" are impaired by the Marina Amendment.
 
 
 45
 Third, RUI argues that even if the Marina Amendment does not affect an express or implied term of the lease agreement, it impairs "the very value bargained for" in the agreement. The "value" to which RUI refers is its anticipated net profit from the lease and operation of the restaurant, which it contends the Marina Amendment will reduce. In support, RUI cites two Lochner-era Supreme Court cases. See Ga. Ry. & Power Co. v. Town of Decatur, 262 U.S. 432, 439, 43 S.Ct. 613, 67 L.Ed. 1065 (1923) (holding unconstitutional town's subjection of newly annexed land to its train-ticket price controls); Boise Artesian Hot & Cold Water Co. v. Boise City, 230 U.S. 84, 92-93, 33 S.Ct. 997, 57 L.Ed. 1400 (1913) (holding unconstitutional city's charging a "rental" fee to utilities laying pipes below city streets). The Court's analysis in these cases, both decided during the heyday of economic due process, has been long superseded by its approach to the Contract Clause developed over the past three decades, subjecting only state statutes that impair a specific (explicit or implicit) contractual provision to constitutional scrutiny.[11] As amici point out, state and local governments routinely impose obligations on resident businesses, compliance with which costs money, which in turn reduces the businesses' profits to the extent of those costs. Compliance with nearly all environmental, workplace-safety, and public-health regulations requires private entities (and often government lessees) to divert resources that could otherwise be realized as profits by their owners. See Matea Gold, Council Deadlocks on Renaming Crenshaw Blvd., L.A. Times, June 26, 2003, at B3 (local business owners opposed to renaming thoroughfare after Tom Bradley, Los Angeles's first African-American mayor, due to increased "doing business" costs associated with the address change, e.g., new stationary, cards, signage). Adoption of RUI's rationale would subject all such measures to constitutional scrutiny, an approach the Supreme Court rejected more than half a century ago.
 
 
 46
 D. That one contracting party is the sovereign does not affect the threshold analysis of whether a specific term in the contract has been impaired.
 
 
 47
 RUI also argues that because the City is a party to the contract, we should afford less deference to its actions in general, and subject them to more stringent Contract Clause scrutiny. Courts, however, apply a decreased deference for self-interested government acts only upon reaching the third component of the Contract Clause analysis — the inquiry into the government's legislative judgment that the ordinance is reasonable and of appropriate character. Energy Reserves, 459 U.S. at 413, 103 S.Ct. 697. We do not reach this inquiry because RUI cannot show that there was any contractual impairment in the first instance.
 
 
 48
 The dissent disregards the segmented inquiry that the Contract Clause requires, as explained supra, at 1147. It would have us examine the government's status as a party in making the threshold inquiry of whether a new law substantially impairs the contract at issue. Our case precedent is clear and contrary to the dissent's views: only once we find that a contract is substantially impaired may we turn to the further questions of legitimate public purpose and reasonableness. See Energy Reserves, 459 U.S. at 413, 103 S.Ct. 697. The government's supposed self-interest is simply not relevant to the factual determinations prerequisite to a finding on this threshold issue — formation, terms and impairment.
 
 
 49
 Although the dissent cites Southern California Gas to support its theory, Southern California Gas actually stands for the proposition that a court conducts a self-interest analysis as part of the "reasonable and necessary" inquiry only after concluding that the contract is substantially impaired. 336 F.3d at 894. In Southern California Gas, we concluded that a "trench cut" ordinance affected a right-to-repair proviso — a "central[,]" "specifically contracted for provision" — of a prior agreement between the City and a gas company. Id. at 892-93. In contrast to the agreement, which allowed the company an opportunity to perform repair work after an excavation and to pay the City for further repairs only if the work was faulty, the ordinance imposed an estimated fee, in advance, regardless of the actual quality of repairs. Id. at 893. By saddling the company with "the cost of reimbursing Santa Ana for repairs and the complication of determining the value of such repairs," we concluded that the ordinance "substantially impairs the separate right to repair damage to streets...." Id. at 894. Only then did we address the City's self-interest in imposing the ordinance. Id. ("Because Santa Ana has substantially impaired its own contract, it has the burden of establishing that the trench cut ordinance is both reasonable and necessary to an important public purpose."). See also University of Hawaii, 183 F.3d at 1106-07 (Court conducts self-interest analysis as part of "reasonable and necessary" inquiry, only after concluding that the contract was substantially impaired); Exxon Corp. v. Eagerton, 462 U.S. 176, 188-90, 103 S.Ct. 2296, 76 L.Ed.2d 497 (1983) (court first concludes that only one of two provisions at issue impacted contractual obligations, then proceeds to assess the general applicability of the implicated provision in its determination of whether the substantial impact was reasonable and necessary).
 
 
 50
 For the first time on appeal, RUI also contends that the Marina Amendment violates the implied covenant of good faith and fair dealing in the lease agreement. Because the issue was not raised before the district court, we do not decide it. In any event, this argument would not help RUI's case. California courts have held "unavailing" a party's contention that "the implied covenant of good faith and fair dealing requires the County to exempt [it] from the application of [a subsequently enacted county ordinance]." Interstate Marina Dev. Co., 202 Cal.Rptr. at 388.
 
 
 51
 The argument that Berkeley impaired RUI's "expected benefit" under the lease is a transparent attempt to resurrect RUI's waived good faith and fair dealing claim. See, e.g., Johnson v. Mutual Ben. Life Ins. Co., 847 F.2d 600, 603 (9th Cir.1988) ("The implied covenant of good faith and fair dealing requires that neither party to a contract will injure the right of the other to receive the benefits of the agreement.") (quotation omitted). In any event, the good-faith doctrine should not be used to second-guess the actions of a contracting party. "The fact that a discretion-exercising party causes the dependent party to lose some or all of its anticipated benefit from the contract ... is insufficient to establish a breach of contract by failing to perform in good faith." Steven J. Burton, Breach of Contract and the Common Law Duty to Perform in Good Faith, 94 Harv. L.Rev. 369, 385 (1980). Accordingly, "courts, mindful that good faith should not be used as a vehicle for judicial fiat, defer to a party who acts with no improper purpose." Id. at 384.
 
 
 52
 The lease agreement provides that RUI will "comply with all applicable ordinance[s] and regulations of the City." Therefore, RUI was on notice that Berkeley could pass future ordinances that might adversely affect RUI's expected benefits under the lease agreement. Furthermore, Berkeley cannot contract out of its police powers or its duties as trustee. See Caminiti v. Boyle, 107 Wash.2d 662, 732 P.2d 989, 994 (1987) ("The state can no more convey or give away this jus publicum interest than it can `abdicate its police powers in the administration of government and the preservation of the peace.'"). In the absence of proof of subterfuge — and the dissent does no more than speculate, post, at 1163 — Berkeley's actions do not evince an "improper purpose" that is inconsistent with the terms of the lease agreement. Because Berkeley acted under rights expressly reserved by it in the lease agreement and consistently with its duties as public trustee, RUI has no basis for its allegation of bad faith interference with expected profits.
 
 
 53
 The dissent would also have us abandon traditional cannons of contractual interpretation to reach the conclusion that silence as to employee wages in a commercial lease agreement somehow creates implied material terms, without telling us what those terms might be. Yet, as the Supreme Court has stated, "[w]e will not strain to reach a constitutional question" through mere speculation. Exxon, 462 U.S. at 188, 103 S.Ct. 2296 (citation omitted). Not only are commercial leases far removed from the collective bargaining agreements at issue in the cases advanced by the dissent, but there are simply no lease terms, material or otherwise, that are implicated by the Marina Amendment. Thus, "Appellant's Contract Clause challenge ... fails for the simple reason that there is nothing to suggest that the [law] nullified any contractual obligations of which appellants were the beneficiaries." Id.
 
 
 54
 We therefore conclude that RUI has failed to show that any provision of its lease agreement with the City was impaired, much less substantially impaired, by the Marina Amendment.
 
 
 55
 Although RUI's Contract Clause claim fails for lack of impairment, we also note that RUI implicitly conceded this claim at oral argument. See Cmty. Hosp. v. Thompson, 323 F.3d 782, 789 n. 5 (9th Cir.2003) (dismissing as moot cross-appeal based on party's concession). In response to our questions about the permissible scope of Berkeley's legislative authority, RUI first agreed that local ordinances setting minimum wages and employment benefits greater than those required under applicable federal or state law are permissible. RUI then acknowledged that Berkeley permissibly could have enacted a citywide living wage ordinance requiring all City businesses, or all City lessees, to pay higher wages to their employees, effective on a date certain. The problem with the Marina Amendment was, according to RUI, that it unfairly targeted Marina businesses for immediate implementation of the higher wages, while other Berkeley businesses (with whom RUI competes for customers) were spared payment of the higher wages until their leases with the City expired (at which point they could expect to negotiate a lower rent from the City).
 
 
 56
 In making this point, RUI assumed that Berkeley's exercise of its police powers to raise employee wages is constitutional, regardless of the existence of preexisting lease agreements or contracts with the affected employers. Thus, RUI's real complaint, as characterized by counsel, is not that the Contract Clause deprives Berkeley of the power to have enacted the ordinances in question, but rather that the manner in which it chose to exercise that power was unfairly discriminatory toward the class of businesses affected by the Marina Amendment. Because it is only the former question which is a proper subject of Contract Clause analysis, RUI's challenge appears potentially viable only under the Equal Protection Clause, to which we now turn.
 
 III.
 
 57
 RUI argues that the Marina Amendment violates its rights under the Equal Protection Clause, United States Const. amend. XIV, § 1, and Article I, Section 7 of the California Constitution. It claims it was unfairly targeted when the City expanded coverage of the Living Wage Ordinance to only a handful of employers — between one and five — due to the geographical restrictions, as well as the limitations on the number of employees (more than six) and annual revenue (more than $350,000). The equal protection analysis under the California Constitution is "substantially similar" to analysis under the federal Equal Protection Clause. See L.A. County v. S. Cal. Tel. Co., 32 Cal.2d 378, 196 P.2d 773, 781 (1948). Therefore, we must determine whether there is "any reasonably conceivable state of facts that could provide a rational basis for the classification," FCC v. Beach Communications, Inc., 508 U.S. 307, 313, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993), because this case involves "social and economic policy," and neither targets a suspect class nor impinges upon a fundamental right. "Where there are `plausible reasons' for [legislative] action, `our inquiry is at an end.'" Id. at 313-14, 113 S.Ct. 2096 (quoting United States R.R. Ret. Bd. v. Fritz, 449 U.S. 166, 179, 101 S.Ct. 453, 66 L.Ed.2d 368 (1980)).
 
 
 58
 In the "Findings" section of the Marina Amendment, the City provided the following reasons for expanding the coverage of the Living Wage Ordinance to the Berkeley Marina:
 
 
 59
 A. The privilege of using the Public Trust tidelands to operate a revenue-generating enterprise should not be extended to parties that will exacerbate the problems associated with inadequate compensation for workers.... The City also expends considerable sums on the maintenance of the Public Trust tidelands as an attractive and pleasant location for both the public and entities operating therein. Therefore, the public interest is best served by requiring that those parties who operate on Public Trust land pay their employees a living wage; and
 
 
 60
 B. Employers who operate on Public Trust land enjoy a unique location and amenities which afford significant financial benefits, a reasonable amount of which should be used to provide employees with a living wage and health care benefits; and
 
 
 61
 C. Members of the public who visit the Public Trust tidelands have a limited choice of businesses to patronize in that area. The public interest is best served by ensuring that the public is not deterred from visiting the Public Trust tidelands because they do not wish to patronize businesses who do not pay their employees a living wage or provide them with health care benefits.
 
 
 62
 Marina Amendment § 1.
 
 
 63
 RUI contends that these were not the real reasons motivating the City Council's decision, but that the City Council was instead motivated by a desire to help in the unionization campaign at a Marina hotel, and that in any case these findings are not supported by any evidence. Furthermore, RUI contends that, to the extent they are legitimate, these rationales for a living wage ordinance existed at the time of the lease renegotiation, and it was therefore improper to act on them afterwards to the detriment of RUI.
 
 
 64
 These contentions are unpersuasive. According to the Supreme Court, "it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature." Beach Communications, 508 U.S. at 315, 113 S.Ct. 2096. The First Circuit has specifically rejected a claim that an environmental ordinance violated the Equal Protection Clause because its challengers alleged that its passage was motivated by a desire to restrict a business's power in dealing with unions. See Int'l Paper Co. v. Town of Jay, 928 F.2d 480, 485 (1st Cir.1991). Furthermore, "a legislative choice is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data." Beach Communications, 508 U.S. at 315, 113 S.Ct. 2096. A person "attacking the rationality of the legislative classification ha[s] the burden `to negative every conceivable basis which might support it.'" Id. (quoting Lehnhausen v. Lake Shore Auto Parts Co., 410 U.S. 356, 364, 93 S.Ct. 1001, 35 L.Ed.2d 351 (1973)); see also Fitzgerald v. Racing Ass'n, 539 U.S. 103, 123 S.Ct. 2156, 2160, 156 L.Ed.2d 97 (2003) ("judicial review is `at an end' once the court identifies a plausible basis on which the legislature may have relied" (quoting Fritz, 449 U.S. at 179, 101 S.Ct. 453)).
 
 
 65
 The crux of RUI's argument is that it was unfair to target only it and a small number of other businesses in the Marina Amendment. As discussed above, RUI concedes the City's authority to regulate wages, and indeed to enact the original Living Wage Ordinance, but challenges the legislative decision that imposed the ordinance's terms on Marina businesses prior to lease negotiation but not upon other similar businesses elsewhere in the City. Such legislative decisions are "virtually unreviewable, since the legislature must be allowed leeway to approach a perceived problem incrementally." Beach Communications, 508 U.S. at 316, 113 S.Ct. 2096. "`[R]eform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind. The legislature may select one phase of one field and apply a remedy there, neglecting the others.'" Id. (quoting Williamson v. Lee Optical of Okla., Inc., 348 U.S. 483, 489, 75 S.Ct. 461, 99 L.Ed. 563 (1955)) (finding a rational basis where the state made geographic distinctions to determine tax rates for slot machines).
 
 
 66
 To the extent that RUI is raising a "class of one" equal protection claim, it fails as well. "A successful equal protection claim may be brought by a `class of one,' when the plaintiff alleges that it has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." Seariver Mar. Fin. Holdings Inc. v. Mineta, 309 F.3d 662, 679 (9th Cir.2002) (citing Vill. of Willowbrook v. Olech, 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000) (per curiam)). Even though "`[c]lassifications should be scrutinized more carefully the smaller and more vulnerable the class is,'" id. (quoting Esmail v. Macrane, 53 F.3d 176, 180 (7th Cir.1995)), a number of large businesses that occupy and profit from prime real estate can hardly be considered vulnerable. Thus, RUI's claim does not merit any special treatment. It was certainly rational, for the reasons discussed above, for the City to treat larger Marina businesses differently from their competitors outside the Marina.
 
 
 67
 Finally, RUI observes that the City's stated rationales for the Living Wage Ordinance and the Marina Amendment existed well before these ordinances were enacted, and before the City renegotiated the lease agreement with RUI. Therefore, RUI contends, it was impermissible for the City to act on the basis of those rationales after it had already signed the revised lease agreement. Of course, the City was aware in 1996 that some of its residents suffered due to an inadequate income, that the City expended a great deal of resources on the Marina area, and that members of the public might prefer not to patronize establishments that pay their employees low wages. However, the rational-basis inquiry is a very lenient one, and specifically "attach[es no] legal significance to the timing" of legislative or municipal action. Bannum, Inc. v. City of Fort Lauderdale, 157 F.3d 819, 822 n. 3 (11th Cir.1998). Thus, the fact that the City could have enacted the Living Wage Ordinance before the lease renegotiation, or that it could have enacted the Marina Amendment as part of the original Living Wage Ordinance, is without constitutional moment.
 
 
 68
 We therefore uphold the City's judgment on the basis of the findings it provided. It is more than reasonable that the City should expect Marina businesses, which receive so many benefits from the City in the form of improvements and lack of competition due to the development moratorium, and which operate on land held in the public trust, to contribute to the welfare of the surrounding community and not to exacerbate its problems. Although RUI claims that any benefit it receives is offset by the rent it pays the City, it is certainly "plausible" for the City legislators to believe that rent alone does not adequately discharge Marina businesses' responsibilities to the public and City. Furthermore, it is certainly "plausible" that certain members of the public might be deterred from patronizing the Berkeley Marina if they knew that the businesses there paid their employees less than a living wage.
 
 IV.
 
 69
 RUI's final claim is that the City of Berkeley deprived it of due process under the United States and California Constitutions. U.S. Const. amend. XIV, § 1; Cal. Const. art. I, § 7. It claims that by including in the Living Wage Ordinance and the Marina Amendment a provision allowing bona fide collective bargaining agreements to opt out of the ordinance, the City effectively unconstitutionally delegated its legislative power to the unions negotiating these contracts. This argument fails as well.
 
 
 70
 The defect in RUI's argument is that a provision allowing employees bargaining collectively to opt out of the provisions of a labor regulation is not a delegation of legislative power at all. See New Motor Vehicle Bd. v. Orrin W. Fox Co., 439 U.S. 96, 109, 99 S.Ct. 403, 58 L.Ed.2d 361 (1978) ("An otherwise valid regulation is not rendered invalid simply because those whom the regulation is designed to safeguard may elect to forgo its protection."). Legislative power is "the power to make laws and to alter them at discretion." Black's Law Dictionary 911 (7th ed.1999). Berkeley's city council used its legislative power to enact an ordinance that covered certain businesses and not others — based on geographic location, number of employees, and the presence or absence of a collective bargaining agreement expressly waiving its applicability. Labor unions negotiating collective bargaining agreements with employers are not legislating, but rather negotiating on behalf of their members; if they reach an agreement with the employer for certain employee benefits and employment conditions that they consider superior to, but incompatible with, the Living Wage Ordinance, the parties can decide to waive its applicability. For example, employees at the Radisson Hotel in the Marina bargained for a pension plan in exchange for hourly wages below the ordinance's rates.
 
 
 71
 As the Supreme Court has observed in a case determining whether a state labor policy was preempted by federal law, "a number of state and federal laws ... draw distinctions between union and nonunion represented employees," Livadas v. Bradshaw, 512 U.S. 107, 131, 114 S.Ct. 2068, 129 L.Ed.2d 93 (1994) (citing 29 U.S.C. § 203(o); D.C.Code Ann. § 36-103 (1993)), in which the content of collective bargaining agreements can affect whether and how a statute applies. The Court referred to these as "familiar and narrowly drawn opt-out provisions." Id. at 132, 114 S.Ct. 2068; see also Cal. Lab.Code § 554 (mandating one rest day per seven-day period "unless the collective bargaining agreement expressly provides otherwise").
 
 
 72
 To support its position, RUI cites yet another Lochner-era case, this time one that found an impermissible delegation of legislative power where maximum hours and minimum wages in the mining industry could be set by majority or two-thirds vote of the producers and miners themselves. See Carter v. Carter Coal Co., 298 U.S. 238, 310-11, 56 S.Ct. 855, 80 L.Ed. 1160 (1936). In that case, the authority to set the hours and wages fell entirely on private parties. Only three years later, however, the Supreme Court found acceptable a statute that required tobacco growers to opt in to its terms by a two-thirds vote. See Currin v. Wallace, 306 U.S. 1, 15-16, 59 S.Ct. 379, 83 L.Ed. 441 (1939). The Currin Court distinguished Carter and explained:
 
 
 73
 This is not a case where a group of producers may make the law and force it upon a minority.... Here it is Congress that exercises its legislative authority in making the regulation and in prescribing the conditions of its application. The required favorable vote upon the referendum is one of these conditions.
 
 
 74
 Id. A provision of a statute allowing bona fide collective bargaining agreements to opt out of a statute is similarly not a legislative delegation, but rather simply a "condition of [the ordinance's] application." In the absence of any legislative delegation, RUI's due process argument fails as well.
 
 V.
 
 75
 The decision of the district court rejecting each of RUI's constitutional challenges to the Marina Amendment to the City of Berkeley's Living Wage Ordinance is
 
 
 76
 AFFIRMED.
 
 
 
 Notes:
 
 
 [1]
 Available at http://www.dol.gov/esa/minwage/america.htm.
 
 
 [2]
 Available at http://www.livingwagecampaign.org/wagelevel.php.
 
 
 [3]
 Available at http://www.dol.gov/dol/esa/public/minwage/main.htm.
 
 
 [4]
 Available at http://www.epinet.org/books/hardships.pdf.
 
 
 [5]
 The doctrine that the public holds the right to tidelands for purposes such as fishing, commerce and navigation originated in Roman lawCity of Berkeley v. Super. Ct. of Alameda County, 26 Cal.3d 515, 521, 162 Cal.Rptr. 327, 606 P.2d 362 (1980). English common law also developed similar limitations to the rights of private persons over tidelands. Id. "After the American Revolution, the people of each state acquired `absolute right to all ... navigable waters, and the soils under them, for their own common use....'" Id. (quoting Martin v. Waddell, 41 U.S. (16 Pet.) 367, 410, 10 L.Ed. 997 (1842). See Shively v. Bowlby, 152 U.S. 1, 57, 14 S.Ct. 548, 38 L.Ed. 331 (1894)) ("At common law, the title and the dominion in lands flowed by the tide were in the King for the benefit of the nation.... Upon the American Revolution, these rights, charged with a like trust, were vested in the original states within their respective borders, subject to the rights surrendered by the constitution to the United States.").
 
 
 [6]
 The dissent argues that the Marina Amendment "shifts the burden of public assistance programs from the City to RUI and its customers."Post, at 1171-72. Nothing in the record supports this supposition. Berkeley does not benefit directly from the ordinance — it is not a "tax" that increases city revenue — so it is inaccurate to characterize Berkeley as a market-participant when it passes an ordinance that dictates employee wages. It is more accurate to characterize the ordinance as an exercise of Berkeley's police power, and most accurate to characterize it as an action by a trustee.
 
 
 [7]
 Although the dissent cites additional facts that it states "reveal why the Marina Amendment is an improper exercise of municipal authority,"post, at 1158, these facts are introduced solely to establish a supposed nefarious motive on behalf of the City Council. Such facts are wholly irrelevant, however, as our analysis of the constitutionality of an ordinance must proceed from the text of the ordinance, not the alleged motives behind it. See Golden State Transit Corp. v. City of Los Angeles, 686 F.2d 758, 761 (9th Cir.1982) ("It is well settled that a reviewing court `will not strike down an otherwise constitutional statute on the basis of an allegedly illicit legislative motive.'" (quoting United States v. O'Brien, 391 U.S. 367, 383, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968))).
 
 
 [8]
 The same principle holds true with regard to lands, like the land at issue here, held in the public trustSee Caminiti v. Boyle, 107 Wash.2d 662, 732 P.2d 989, 994 (1987) ("The state can no more convey or give away [the public trust] interest than it can `abdicate its police powers in the administration of government and the preservation of the peace.'") (quoting Illinois Cent. R. Co. v. Illinois, 146 U.S. 387, 453, 13 S.Ct. 110, 36 L.Ed. 1018 (1892)).
 
 
 [9]
 It is safe to say that neither the majority nor dissent supports "arbitrary exercises of sovereign authority," but surely it is not simply the Contract Clause which protects government contractors from arbitrary acts
 
 
 [10]
 In its lengthy string cite of parentheticals, the dissent fails to reference the specific terms of the contracts that the courts found were impairedSee Southern California Gas, 336 F.3d at 892 (specific terms providing Gas Company "right to excavate" and right to "repair streets after excavations."); State of Nevada Employees Ass'n v. Keating, 903 F.2d 1223, 1225 (9th Cir.1990) (specific term providing employees the right to "withdraw their [pension] contribution at any time without penalty."); Continental Illinois National Bank & Trust Co. v. Washington, 696 F.2d 692, 695 (9th Cir.1983), appeal dismissed sub nom., The Don't Bankrupt Washington Committee v. Continental Illinois National Bank & Trust Co., 460 U.S. 1077, 103 S.Ct. 1762, 76 L.Ed.2d 338 (1983) (specific terms providing inter alia that "[State] was `duly authorized under all applicable laws to create and issue ... bonds,'" ... where such bonds "were revenue bonds to be paid solely from `income, revenues, receipts and profits derived by ... ownership and operation ... of the project.'"); Sonoma County Organization of Public Employees v. County of Sonoma, 23 Cal.3d 296, 152 Cal.Rptr. 903, 905, 591 P.2d 1 (1979) (specific term providing "employees represented by the petitioner labor organizations a wage increase...."); Interstate Marina Dev. Co. v. County of L.A., 155 Cal.App.3d 435, 202 Cal.Rptr. 377, 382 n. 5 (1984) (specific term providing lessees the right to "sublease portions of the demised premises for a period not to exceed one year...."); Associated Builders & Contractors v. Baca, 769 F.Supp. 1537, 1549 (N.D.Cal.1991), aff'd on other grounds sub nom. Chamber of Commerce of the United States v. Bragdon, 64 F.3d 497, 502 (9th Cir.1995) (specific term providing wage benefits under collective bargaining agreements); Ross v. City of Berkeley, 655 F.Supp. 820, 828 (N.D.Cal.1987) (specific term providing for a "fixed five-year lease.").
 
 
 [11]
 The facts inBoise Artesian are strikingly similar to those of our recent Southern California Gas case, where we invalidated a similarly blatant ordinance, essentially double-charging a utility for a right for which it already paid. Cf. Boise Artesian, 230 U.S. at 92-93, 33 S.Ct. 997, with Southern California Gas, 336 F.3d at 887-88. This does not revive the Lochner-era Contract Clause analysis, but instead simply demonstrates how distinct jurisprudential principles can produce the same result in similar cases.
 
 
 BYBEE, Circuit Judge, dissenting:
 
 77
 Laws that work an "impairment of a State's own contracts ... face more stringent examination under the Contract Clause than [do] laws regulating contractual relationships between private parties...." Allied Structural Steel Co. v. Spannaus, 438 U.S. 234, 244 n. 15, 98 S.Ct. 2716, 57 L.Ed.2d 727 (1978). There is a good reason for this. Parties enter into contracts to "order their personal and business affairs according to their particular needs and interests. Once arranged, those rights and obligations are binding under the law, and the parties are entitled to rely on them." Id. at 245, 98 S.Ct. 2716. When the state is a party, there is an additional risk that it will employ its sovereign powers to alter the settled terms of the contract. Although the temptation to secure by legislation what a state has failed to achieve through negotiation is great, the Contract Clause commands that states resist this temptation.
 
 
 78
 The City of Berkeley succumbed to this temptation by employing its sovereign power to secure terms that it failed to negotiate in its proprietary capacity with RUI. Through the Marina Amendment, the City imposed obligations on a small number of businesses holding long-term contracts with the City (such as RUI) and, moreover, it made these obligations retroactive. The Marina Amendment is, accordingly, a rule of neither general nor prospective applicability. See Landgraf v. USI Film Products, 511 U.S. 244, 266-67 & n. 20, 114 S.Ct. 1483 (1994); Exxon Corp. v. Eagerton, 462 U.S. 176, 191-92, 103 S.Ct. 2296, 76 L.Ed.2d 497 (1983). Berkeley violated the Contract Clause of the United States Constitution because it has "impair[ed], by legislation, the obligation of its own contracts." Woodruff v. Trapnall, 51 U.S. 190, 207, 10 How. 190, 13 L.Ed. 383 (1850). I respectfully dissent.[1]
 
 I.
 
 79
 The majority forgoes a factual recitation of how Berkeley passed the Marina Amendment. These facts bear retelling and I recite them, because they reveal why the Marina Amendment is an improper exercise of municipal authority that offends the Contract Clause. After describing how the Marina Amendment substantially impairs RUI's lease, I discuss why the Marina Amendment is not a valid exercise of Berkeley's sovereign power. I then proceed to the analysis that the majority fails to reach, the two additional prongs of the Supreme Court's framework for Contract Clause challenges.
 
 
 80
 In 1999, the City commissioned a survey of living wage laws in other cities and an economic study of the potential impact in Berkeley of such a provision. The survey found that cities had not adopted a living wage for employers generally. Instead, they had required a living wage as a condition for entering into new municipal contracts or renewing existing ones.[2]
 
 
 81
 The study of the economic impact of such a policy for Berkeley recognized that a living wage ordinance ("LWO") would raise labor costs. It identified three groups who would potentially bear the incidence of these additional costs: (1) the City might receive lower rent revenue when its leases became subject to the LWO because lessees would demand a rent reduction to compensate for the higher labor costs; (2) consumers might have to pay higher prices for the goods and services because businesses subject to the LWO would pass the increased labor costs onto consumers; and (3) employers might realize lower profits because they could not recover all of the higher labor costs through rent reductions or higher prices. The study could not predict precisely what share of the additional costs each of these groups would bear, but warned that "most of the direct costs of a living wage policy will be born by the City of Berkeley." Howard C. Greenwich, City of Berkeley Living Wage Analysis 8 (Nov. 30, 1999) ("Greenwich Study").
 
 
 82
 The Greenwich Study recommended that any LWO cover leaseholders with more than seven employees and gross revenues over $200,000. With respect to how many lessees would be covered, the study observed:
 
 
 83
 Although not enough surveys were returned to accurately estimate the financial impact of lessee coverage, it would have a major impact at the Marina. Three leaseholders, a hotel and two restaurants, are major employers of low-wage workers. Because these employers hold long-term ground leases, with the next expiration in 2017, the City should consider requiring a living wage during the next rent negotiating period starting in 2004. The lessees may demand reduced rent if they are required to comply with the living wage ordinance.
 
 
 84
 Id. The Greenwich Study specifically recommended that the City "consider rent adjustment times for triggering living wage requirements. Otherwise, the three largest businesses [at the Marina] that employ low-wage workers will not be covered until the year 2017." Id. at 32. The three major employers at the Marina were the Radisson hotel; HS Lordships, a restaurant; and Skates, a restaurant owned by RUI.
 
 
 85
 After receipt of the study, the City Manager wrote a memorandum to the Mayor and City Council stating that the proposed LWO would have no "significant financial impact" on city lessees at the Marina, because these leases "do not have open negotiations for any where from 10-15 years." The memorandum also noted the "proposal from the Living Wage advocacy community" to apply the LWO to Marina employers, but "recommended that any concept of a `living wage zone' be referred to the City Attorney for further analysis and review." In a second memorandum, the day before the Council voted on the LWO, the City Manager again advised that "[t]hose leases most targeted by the living wage advocates, the Marina leases, do not have open negotiations for anywhere from 10-15 years."
 
 
 86
 Berkeley adopted the LWO in June 2000. Berkeley, Cal., Ordinance 6548-N.S. (June 27, 2000) (creating Berkeley Municipal Code § 13.27). The LWO does several things. First, the ordinance identifies the employers subject to the LWO. It applies to parties conducting business with Berkeley or receiving some financial benefit from it, such as contractors, licensees, and lessees. The LWO applies only to employers with more than six employees and at least $350,000 in annual revenue. Id. § 13.27.030. It also exempts employers "subject to a bona fide collective bargaining agreement where the waiver of the provisions of this Ordinance are[sic] set forth in clear and unambiguous terms in such an agreement." Id. § 13.27.070.H. Second, the LWO mandates a scale of minimum hourly wages keyed to the provision of health benefits. It sets the hourly wage at $9.75/hour for employers that furnish health benefits and at $11.37 for employers that do not.[3] Id. § 13.27.050(A). It also requires employers to offer workers twenty-two days off per year for vacation, sick leave, or personal necessity, and at least twelve of which must be paid days. Id. § 13.27.050(B). Third, the LWO establishes a private right of action for employees in county and state courts. Id. § 13.27.090-.100.
 
 
 87
 The LWO applies to every city contract or lease as of the date of the agreement with the City or the date when the agreement is amended. Id. § 13.27.060. A memorandum from the City Attorney to the City Manager and Department heads issued shortly after the City Council adopted the LWO discussed how to deal with "contracts and leases that were already `in the pipeline.'" Contracts and leases approved by the City Council after June 20, 2000, and otherwise subject to the LWO, might have to be "re-assemble[d]." The memo noted that "Revising contracts and leases that are actually impacted by the LWO may involve some re-negotiation."
 
 
 88
 One month later, in July 2000, representatives of Appellee Hotel Employees and Restaurant Employees Union Local 2850 sent two faxes to the City Council urging it to amend the LWO to apply immediately to the Marina lessees. The first asked the Council to "do everything in its power, including restructuring [the City Attorney's] workload if necessary" to make possible a vote on an amendment to the ordinance at a Council meeting in eleven days. It exhorted the Council not to "leave behind ... the [Marina hotel] workers, who worked so hard to get [the LWO] passed." The fax included a draft of a proposed amendment that provided: "Notwithstanding any other provision of this Chapter, the compensation requirements of [the LWO] shall become effective for businesses located on public trust lands thirty (30) days after the effective date of this Ordinance." The second fax, sent ten days later, requested that the Council direct the City Attorney to put the amendment in "a form that the City Council can put to a vote" and to clarify its intent to develop an ordinance that will "cover large hospitality employers, particularly those at the Berkeley Marina."
 
 
 89
 In September 2000, the Council adopted the "Marina Amendment" to the LWO. The Marina Amendment applies to entities within the "Marina Zone" that employ six or more workers and generate $350,000 or more in annual gross receipts. Berkeley, Cal., Ordinance 6583-N.S. (Sept. 19, 2000) (amending Berkeley Municipal Code § 13.27). It defines the Marina Zone to include only lands that Berkeley held in public trust, id. § 13.27.020(B), and therefore, it does not reach any employers who were not already conducting business with the City. Although the Marina Amendment does not expressly provide for an effective date, and although the LWO applied prospectively, Berkeley understood the Marina Amendment to apply retroactively to existing leases.
 
 II.
 
 90
 The majority dismisses RUI's claims because it concludes that Berkeley has not impaired any "specific terms" of its lease with RUI. Maj. op. at 1147 (quoting General Motors Corp. v. Romein, 503 U.S. 181, 186, 112 S.Ct. 1105, 117 L.Ed.2d 328 (1992)). I respectfully disagree. I would find that Berkeley and RUI have a contract and that the Marina Amendment substantially impaired it. I would then require Berkeley to carry its "burden of establishing that [the law] is both reasonable and necessary to an important public purpose." S. Cal. Gas Co. v. City of Santa Ana, 336 F.3d 885, 894 (9th Cir.2003). Accord Energy Reserves Group, Inc. v. Kansas Power & Light Co., 459 U.S. 400, 411-12, 103 S.Ct. 697, 74 L.Ed.2d 569 (1983). In my view, Berkeley cannot satisfy this "heavy burden." S. Cal. Gas, 336 F.3d at 896.
 
 
 91
 * The majority finds that "[n]o specific provision of the lease agreement addressed payment to or employment benefits for RUI's employees." Maj. op. at 1147. The majority is, of course, formally correct that the lease contains no provision expressly addressing the compensation of RUI's employees. This observation, however, does not end our inquiry.
 
 
 92
 A broader, and to my mind more common-sense, view of the contract between Berkeley and RUI compels the conclusion that the Marina Amendment affects the agreement the parties reached in 1996 and that the impairment is substantial. See Romein, 503 U.S. at 186, 112 S.Ct. 1105. The Marina Amendment impaired the lease agreement in at least two ways. First, it violated a general principle of contracts that the agreement between the parties is contained within the four corners of the document. Berkeley could have negotiated with RUI for a living wage in 1996. It did not. Instead, in 2000, upon realizing that RUI's contract could not be renegotiated for some years, Berkeley simply adopted an ordinance directed at the Marina lessees and made it effective immediately. Second, the Marina Amendment reduced RUI's expected profits by imposing additional operating costs on RUI, costs that Berkeley knew were the legitimate subject of negotiation.
 
 
 93
 * Federal law controls whether an agreement constitutes a contract for purposes of Contract Clause analysis, although we will" `accord respectful consideration and great weight'" to state contract principles. Romein, 503 U.S. at 187, 112 S.Ct. 1105 (quoting Indiana ex rel. Anderson v. Brand, 303 U.S. 95, 100, 58 S.Ct. 443, 82 L.Ed. 685 (1938)). Under California law, lease agreements for a period longer than one year must be in writing, Cal. Civ. Code § 1624(a)(3) (West 2003), and are subject to the "general rules of interpretation applicable to all contracts." Stockton Theatres, Inc. v. Palermo, 124 Cal.App.2d 353, 268 P.2d 799, 801 (1954). California requires that "[w]hen a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible...." CAL. CIV. CODE § 1639 (West 2003). RUI's lease also contained an integration clause, and the inclusion of an integration clause in a written contract precludes subsequent modifications, absent additional writings by the parties. See Masterson v. Sine, 68 Cal.2d 222, 65 Cal.Rptr. 545, 436 P.2d 561, 563-64 (1968) (an integrated contract is the parties' complete and final agreement); CAL. CIV. CODE § 1698 (West 2003) (permitting modification in writing of a written contract). Furthermore, except as otherwise provided by statute,"[a]ll contracts, whether public or private, are to be interpreted by the same rules...." CAL. CIV. CODE § 1635 (West 2003). California courts have distinguished between government's proprietary and sovereign capacities and held that governments acting in their "proprietary or business capacity" are not entitled to certain rules, defenses, or presumptions to which they are entitled when acting in a sovereign capacity. Corp. of America v. Durham Mutual Water Co., 50 Cal.App.2d 337, 123 P.2d 81, 83 (1942). Accord M.F. Kemper Constr. Co. v. City of Los Angeles, 37 Cal.2d 696, 235 P.2d 7, 12 (1951).
 
 
 94
 In 1996, RUI and the City renegotiated the lease agreement when RUI sought the City's approval to assign the lease to a subsidiary, and the City took the position that it could withhold its approval for any reason. The 1996 negotiations were quite specific, and the parties negotiated three new terms. First, Berkeley negotiated for, and obtained, a higher rental payment. Under the original lease, Berkeley was entitled to 2.75% of the lessee's "gross receipts"; under the new lease it receives 3% of RUI's "gross receipts" until 2007, and 3.3% through the end of the lease in 2018. Second, Berkeley insisted on, and obtained, RUI's agreement to install a new grease trap, at an expected cost of $50,000 to $55,000. Third, Berkeley demanded, and RUI agreed, that RUI would pay $7,000 per year for landscaping.
 
 
 95
 The lease is silent on the question of RUI's employee wages and benefits. The fact that the lease, which constitutes the entire agreement between the parties, does not set employee wages and benefits necessarily implies that the parties agreed not to contract on wages and benefits.[4] Cf. Sonoma County Org. of Pub. Employees v. County of Sonoma, 23 Cal.3d 296, 152 Cal.Rptr. 903, 591 P.2d 1, 7 (1979) ("An increase in wages is frequently the very heart of an employment contract; other provisions, including those relating to fringe benefits, are inextricably interwoven with those relating to wages, since employees may surrender various employment benefits in exchange for a wage increase.") Berkeley could have insisted on a wages and benefits provision. Since it did not and since the written contract constitutes the entire agreement of the parties, Berkeley may not later insert an additional term. To the contrary, contractual silence in the presence of an integration clause implies that, absent a generally applicable law, Berkeley promised not to impose unilaterally higher wage and benefits costs on RUI.
 
 
 96
 If the litigants were both private parties, contractual silence on wages together with an integration clause would clearly prevent the lessor from subsequently altering the bargain they had struck by requiring the lessee to pay some prescribed wage. Because the compensation of the lessee's employees falls outside the scope of the integrated lease agreement, the lessor has no authority to insist the lessee pay some prescribed wage. Similarly, contractual silence on wages in an integrated agreement allows the employer, subject to generally applicable local, state and federal laws, to work out its own arrangements with its employees. In effect, silence in this integrated lease contract represents Berkeley's agreement not to interfere in RUI's wage setting. Noninterference is thus an understood, or implicit term in the contract in the same sense that other unnegotiated terms — covering the signage, the dining room decor, or a gift shop, for example — are similarly left to RUI.
 
 
 97
 Our court has recognized that the Contract Clause protects such implied contractual terms. For example, in Univ. of Hawaii Prof'l Assembly v. Cayetano, 183 F.3d 1096 (9th Cir.1999) we held that although a collective bargaining agreement governing state employees made no specific mention of dates on which the employees were to be paid, "[a] course of dealing can create a contractual expectation," and that for over twenty-five years, the state had paid its employees on particular days. Id. at 1102. The timing of pay days was "material to the terms of employment," "a negotiable matter," and thus an "implicit term[]" of the employment contract. Id.
 
 
 98
 Moreover, Berkeley established a course of dealing with RUI. Berkeley does not allege that it ever, in the more than 30 years that RUI or its predecessor in interest has held a lease at the Marina, previously sought to set the wages its lessees paid their employees. Berkeley's own economic expert acknowledged, and the City Manager explicitly stated, that the LWO could not reach the Marina leases until their terms expired. Berkeley's tacit recognition that it could not alter the terms of existing leases was evident in its applying the original LWO to prospective leases only. The subsequent Marina Amendment contravened the implicit terms created by its prior course of dealing.
 
 
 99
 When it adopted the Marina Amendment and applied it to existing leases, the City effectively rewrote RUI's lease by ordinance. As the record plainly shows, Berkeley knew that the Marina Amendment would have an immediate impact on RUI and perhaps two other leaseholders at the Marina. Berkeley used its sovereign authority to achieve what it failed to negotiate in its proprietary capacity.
 
 
 100
 The Contract Clause protects parties doing business with the government from such arbitrary exercises of sovereign authority, as we and California state courts have recognized.[5] The Contract Clause's protections cannot be so easily circumvented by faulting RUI for failing to negotiate "specific terms" regarding matters it could not have anticipated. If that were so, then nothing would prevent Berkeley-the-sovereign from requiring RUI to hang new signage, redecorate its dining room, or do anything else that Berkeley-the-market-participant "forgot" to include in its lease. Even worse, Berkeley could legislate terms that it attempted, but failed, to negotiate. Had RUI and Berkeley not reached agreement on the grease trap, the majority would allow Berkeley to enact a grease trap ordinance directed at RUI. Under the principle adopted by the majority, there is no end to the terms that Berkeley might legislatively rewrite, so long as they are not covered by "specific terms" in the lease.
 
 2
 
 101
 The Marina Amendment impaired RUI's lease in a second way: It reduced RUI's expected profits by imposing additional operating costs on RUI. Although RUI is not entitled to any particular rate of return or level of profits under its lease, it might have negotiated differently Berkeley's share of the gross receipts had it known of the Marina Amendment. As in any commercial transaction, RUI values the lease for its expectation, the amount of profits it anticipates from operating a restaurant at the Marina. By requiring that RUI pay higher wages, more generous benefits, and potentially higher rent, the Marina Amendment raises the cost of operating the restaurant, and consequently, reduces the value of the lease to RUI. From RUI's perspective, the Marina Amendment is tantamount to an increase in the rent due to Berkeley.[6] The total cost of leasing a space is a matter "so central to the bargained-for exchange between the parties ... that it must be deemed a term of the contract." Romein, 503 U.S. at 188-89, 112 S.Ct. 1105. An increase in RUI's cost of operating Skates is "a severe impairment that defeats the expectations of the parties under the contract." Cont'l Illinois Nat'l Bank & Trust Co. v. Washington, 696 F.2d 692, 700 (9th Cir.1983), appeal dismissed sub nom., The Don't Bankrupt Washington Comm. v. Cont'l Illinois Nat'l Bank & Trust Co., 460 U.S. 1077, 103 S.Ct. 1762, 76 L.Ed.2d 338 (1983).
 
 
 102
 The majority inexplicably rejects the idea that the value of the lease to RUI is the profit RUI anticipates from operating the restaurant and that the Marina Amendment reduces this value. Maj. op. at 1153-54. Instead, the majority implies that any inquiry beyond the narrowest rendering of the contract risks resurrection of Lochner v. New York, 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937 (1905). Our analysis, however, has nothing to do with substantive economic due process. The Contract Clause addresses legislation that retroactively impairs contracts. The abandoned doctrine of Lochner prohibited certain prospective contracts.[7] Unlike the judicially-created doctrine of substantive economic due process, "the Contract Clause remains part of the Constitution." Spannaus, 438 U.S. at 241, 98 S.Ct. 2716. Consistent with Contract Clause precedents, and contrary to Lochner, we do not "engage in a utilitarian comparison of the public benefit and public loss." U.S. Trust Co. v. New Jersey, 431 U.S. 1, 29, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977); cf. Lochner, 198 U.S. at 75, 25 S.Ct. 539 (Holmes, J., dissenting) ("a constitution is not intended to embody a particular economic theory"). The desirability of living wage laws is thus irrelevant to the Contract Clause question before us. The Contract Clause is a neutral rule that protects workers as well as businesses. See, e.g., Univ. of Hawaii Prof'l Assembly, 183 F.3d at 1103; State of Nevada Employees Ass'n v. Keating, 903 F.2d 1223, 1228 (9th Cir.1990); Sonoma County Org. of Public Employees, 152 Cal.Rptr. 903, 591 P.2d at 11. Moreover, my review of Contract Clause cases in California[8] and other courts[9] reveals that the Clause is invoked most often by public employees to prevent municipal and state governments from reducing their compensation during times of fiscal crisis.
 
 3
 
 103
 To offend the Contract Clause, the impairment must be substantial, Energy Reserves, 459 U.S. at 411-12, 103 S.Ct. 697, and the Marina Amendment satisfies this test. RUI estimated that the Marina Amendment will increase its annual labor costs by $121,000 per year, which represents a 22% decrease in its net revenues. Relative to RUI's average annual rent for the preceding three years of roughly $197,000 per year, the increased labor costs represent a 61% increase in the cost to RUI of satisfying its contractual obligations under the lease. The significance of the impairment was also immediately apparent to Berkeley. The City-sponsored Greenwich Study advised that, if applied prospectively, the LWO would prompt potential lessees to insist on lower rents. Whether RUI would have negotiated lower rent in view of the LWO is unknown, because Berkeley imposed the Marina Amendment on RUI's existing lease almost immediately.
 
 
 104
 The Marina Amendment's cost to RUI, however, was far greater than that of the other provisions that RUI and Berkeley actually negotiated. During the last negotiations of the lease in 1996, Berkeley and RUI bargained over who would bear the $50,000 cost of installing a "grease trap." Even more telling, they bargained over $7,000 in landscaping costs. If the parties perceived that these expenditures were sufficiently material to warrant negotiation, then the Marina Amendment — which could raise labor costs by more than $100,000 — is certainly a substantial impairment. Moreover, the City Manager felt these items were substantial enough to warrant writing a detailed report on them to the City Council. Upon completion of the 1996 negotiations, Berkeley's City Manager drafted a memorandum to the Mayor and City Council describing the financial impact of the new lease. He estimated that through 2007, the City would gain an additional $22,000, and from 2007 to the end of the lease in 2018, Berkeley would gain an additional $27,000. All of these amounts pale in comparison to the expected cost to RUI of the Marina Amendment.
 
 
 105
 One of Berkeley's expert witnesses, a CPA, examined RUI's books and testified that the "cost of compliance with the Living Wage Ordinance is not so significant or so adverse as to cause Skates restaurant to close its doors and does not threaten its viability." Perhaps that is the case, but the expert's thesis is so modest that it renders his statement irrelevant. "Total destruction of contractual expectations is not necessary for a finding of substantial impairment," U.S. Trust, 431 U.S. at 26-27, 97 S.Ct. 1505, and "[e]ven adjustments in implicit financial terms can constitute substantial impairment." S. Cal. Gas, 336 F.3d at 890. Whether measured in expected profits or in terms of how the parties actually responded, the Marina Amendment's impairment of RUI's lease is substantial.
 
 4
 
 106
 The majority believes that because Berkeley could have passed a generally and prospectively applicable ordinance that, like a minimum wage law, set compensation and benefits above the amounts required by state and federal law, the Marina Amendment is necessarily a valid exercise of Berkeley's police power. Maj. op. at 1153-54. "[T]he Contract Clause does not require a State to adhere to a contract that surrenders an essential attribute of its sovereignty." U.S. Trust, 431 U.S. at 23, 97 S.Ct. 1505. In most cases, the general and prospective applicability of a change in the law assures private parties with public contracts that the state will not impair its contractual obligations with them (or, what is the same thing, enhance the private parties' obligations). However, the Marina Amendment differs from an exercise of police power in two respects: (1) it singles out RUI for a change in its contract rather than applying generally to a broad range of employers; and (2) it retroactively alters the bargain that RUI and Berkeley struck.
 
 
 107
 First, generally applicable legislation typically protects the contracting party from special interest legislation or political gamesmanship. See Exxon, 462 U.S. at 191-92, 103 S.Ct. 2296. Even generally applicable legislation, however, may run afoul of the Contract Clause if the parties specifically negotiated a different term. See, e.g., Air Cal, Inc. v. City & County of San Francisco, 865 F.2d 1112, 1117 (9th Cir.1989) (San Francisco's proprietary power "encompasses the power to regulate use of the property by ordinance, so long as the city has not chosen to enter contracts for use that are inconsistent with such regulations") (citations omitted). In most instances, however, a party to a government contract affected by legislation must follow a law of general applicability just like everyone else.
 
 
 108
 Where the Marina Amendment is concerned, "just like everyone else" turns out to be RUI and, perhaps, no one else. When Berkeley contemplated the Marina Amendment, the City Attorney admitted that "[a]lthough it is obvious that some of the larger Marina entities, such as Skates, HS Lordships and the Radisson, will be covered by the amended Ordinance, the City does not know with any certainty which other entities will be included." However, of the three principal leaseholders in the Marina Zone, the Radisson, HS Lordships, and Skates (owned by RUI), only Skates is currently subject to the Marina Amendment. Both the Radisson and HS Lordships have collective bargaining agreements and are thus exempt from the LWO and the Marina Amendment. Berkeley, Cal., Ordinance 6548-N.S. (June 27, 2000), § 13.27.070H. Berkeley also sent notice of the proposed amendment to other parties, including water-based entities, such as yacht, water-ski, and rowing clubs; and small retailers, including a caterer and a kite shop. But, it is unlikely the Marina Amendment covers any of the smaller entities, because they do not meet the threshold of six or more employees and $350,000 in annual gross receipts. Id. § 13.27.030. RUI has alleged that, at the very most, five businesses are currently subject to the Marina Amendment. "But whether or not the legislation was aimed largely at a single employer, it clearly has an extremely narrow focus." Spannaus, 438 U.S. at 248, 98 S.Ct. 2716 (footnote omitted).
 
 
 109
 This narrow reach distinguishes the Marina Amendment from a minimum wage law. If Berkeley had raised the minimum wage through a law of general applicability, RUI would not have cause to complain based on contractual silence in the lease. But that is precisely the problem here. The Marina Amendment is not a law of general applicability. RUI has a valid claim under the Contract Clause because Berkeley enacted a law that was obviously directed at RUI and, maybe, a couple of other Marina lessees. Berkeley may not alter RUI's lease at will just because the City Council, rather than the City's procurement staff, approved the changes. Berkeley abused its sovereign prerogatives to gain an advantage in a lease it entered into in its proprietary capacity.
 
 
 110
 Second, the Supreme Court has repeatedly expressed its suspicion of retroactive laws because they are "generally unjust," Eastern Enterprises v. Apfel, 524 U.S. 498, 533, 118 S.Ct. 2131, 141 L.Ed.2d 451 (1998) (O'Connor, J., plurality) (citation omitted), and "deprive citizens of legitimate expectations and upset settled transactions." Romein, 503 U.S. at 191, 112 S.Ct. 1105. Accord Bowen v. Georgetown Univ. Hospital, 488 U.S. 204, 208, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988). Although the Court frequently tests retroactive legislation against the Due Process Clause, it has noted that the Contract, Bill of Attainder, Ex Post Facto, and Takings Clauses specifically codify the "antiretroactivity principle." Landgraf, 511 U.S. at 266, 114 S.Ct. 1483.
 
 
 111
 Narrowness or retroactivity alone does not offend the Contract Clause. A municipality may require a prescribed wage of all employers, including its lessees, through a law of general applicability, such as a minimum wage law.[10] Alternatively, a narrow but prospectively applied provision would allow lessees the opportunity to bargain for different terms. A comparison of the original LWO and the Marina Amendment makes plain these differences.[11] Unlike the Marina Amendment, the original LWO was both prospective and generally applicable. It applied to parties doing business with the City everywhere in Berkeley, rather than just those in a narrow geographic area, and it applied to contracts entered into after the date of its enactment, rather than to already bargained-for contracts. Consequently, if RUI were challenging the original Living Wage Ordinance rather than the Marina Amendment, it would have no objections based on the Contract Clause. However, because the Marina Amendment is neither generally nor prospectively applicable, I believe it is not a valid exercise of police power and that it contravenes the Contract Clause.
 
 5
 
 112
 The majority further reasons that RUI and Berkeley agreed that RUI would abide by future law, including, presumably, the Marina Amendment. Maj. op. at 1153-54. Paragraph 25 of the lease specifies that the lessee shall "comply with all applicable ... ordinances ... of the City...." RUI's contractual promise to comply with applicable city ordinances is not the equivalent of agreeing that the City may amend the lease at will, so long as it does so through an ordinance. The provision is simply a boilerplate promise to obey the law — a provision common in leases between private parties — the violation of which would be grounds for Berkeley to seek contractual remedies for breach.
 
 
 113
 We have previously held that such provisions are not open invitations to government parties to alter their contracts. In S. Cal. Gas, 336 F.3d 885, the gas company and the City of Santa Ana had entered into a contract in 1938 that provided the City could demand payment for the cost of repairs to public property caused by gas company operations. 336 F.3d at 887-88. The contract also provided that the gas company would comply with "all of the ordinances, rules and regulations heretofore or hereafter adopted by [the City] in the exercise of its police powers." Id. at 888. In 2001 the City adopted a "trench cut ordinance" requiring advance payment, without consideration for actual damages or the quality of the repairs. We rejected the City's argument that the parties had agreed future ordinances could alter the lease and found that Santa Ana had violated the Contract Clause. Calling the City's interpretation "absurd," we held that the contract could not be read "in such a way that reserves to Santa Ana the power to unilaterally alter the terms of the agreement." Id. at 893. See also Cont'l Illinois Nat'l Bank, 696 F.2d at 698.
 
 
 114
 RUI surely did not consent to have the City make whatever changes to the lease it wished. The fact that the City effectively amended the lease by legislation — a narrow and retroactive ordinance — cannot relieve Berkeley of the duty to comply with the Contract Clause.
 
 B
 
 115
 Because it erroneously concluded that RUI's lease was not impaired, the majority did not reach the subsequent steps of the Contract Clause analysis. Once RUI demonstrated that Berkeley substantially impaired its contract, the state must show that a "significant and legitimate public purpose" justifies the law and that it does not merely "provid[e] a benefit to special interests with its police power." Energy Reserves, 459 U.S. at 411-12, 103 S.Ct. 697. I would conclude that the Marina Amendment does not serve such a purpose and that it is unreasonable and unnecessary.
 
 
 116
 * The LWO, as originally enacted, serves a broad social purpose. The "living wage" is a relatively new and aggressive approach to problems that local jurisdictions have historically addressed through a combination of minimum wage laws and public assistance programs. Berkeley's City Council included a number of legislative findings as a preamble to the LWO. The City found, for example, that "far too many people working in Berkeley and their families live below or near the poverty line," that inadequate compensation "fails to provide service employees with resources sufficient to afford life," and that the "privilege of using public property to operate a business should not be granted to parties that will exacerbate the problems associated with inadequate compensation of workers." Berkeley, Cal., Ordinance 6548-N.S. (June 27, 2000), § 1 d, f, g. To the latter end, the LWO serves the purpose of instructing city negotiators and placing would-be contractors on notice that Berkeley will demand a living wage provision in all future contracts.
 
 
 117
 What is at issue here, however, is not the purpose of the LWO, but the legitimacy of the Marina Amendment. The Supreme Court has distinguished "generally applicable rule[s] of conduct," Exxon Corp., 462 U.S. at 191-92, 103 S.Ct. 2296, that remedy "broad, generalized economic or social problem[s]," Spannaus, 438 U.S. at 250, 98 S.Ct. 2716, from enactments that have "a very narrow focus" and are "aimed at specific" parties. Energy Reserves, 459 U.S. at 412 n. 13, 103 S.Ct. 697. "The requirement of a legitimate public purpose guarantees that the State is exercising its police power, rather than providing a benefit to special interests." Id. at 412, 103 S.Ct. 697.
 
 
 118
 The Marina Amendment, "imposing a sudden, totally unanticipated, and substantial retroactive obligation upon the company to its employees, was not enacted to deal with a situation remotely approaching the broad and desperate emergency economic conditions" described by the City Council. Spannaus, 438 U.S. at 249, 98 S.Ct. 2716. Several aspects of the Marina Amendment show that it does not serve a broad social purpose. Most obviously, as previously pointed out, the parties are uncertain as to how many employers are even subject to the Marina Amendment, but the number is probably fewer than five.[12]
 
 
 119
 Just as the living wage amendment narrowly assigns its burdens, it narrowly directs its benefits. The Marina Amendment covers only a modest number of workers, and many of these will not receive the living wage because a collective bargaining agreement exempts their employers, such as the Radisson and HS Lordships, from the ordinance.[13] With so few beneficiaries the Marina Amendment falls well short of addressing a broad social problem and appears to address only the demands of Local 2850 members in the Marina Zone. Furthermore, any claim Berkeley could make for the need to remedy conditions among workers citywide is belied by the fact that Berkeley did not apply the LWO retroactively to other city contractors, nor did it apply the LWO to private employment contracts. The City has offered no explanation why employees at the Marina have any different needs or circumstances than other employees in Berkeley. In sum, "this law can hardly be characterized, like the law at issue in the Blaisdell case, as one enacted to protect a broad societal interest rather than a narrow class." Spannaus, 438 U.S. at 248-49, 98 S.Ct. 2716.
 
 
 120
 Courts within our circuit have been skeptical of public contracts that furnish benefits to a small class by retroactively impairing the contracts of another small class. In Ross v. City of Berkeley, 655 F.Supp. 820 (N.D.Cal.1987), the City of Berkeley enacted an ordinance that limited the grounds for eviction or lease non-renewal on commercial properties in a particular City district. Id. at 823-26. The acceptable grounds for eviction did not include owner occupancy. Id. Judge Patel found that the City's ordinance "isolate[d] one group of commercial lessors ... and nullifie [d] a central aspect of their contractual rights." Id. at 833. She disapproved of the ordinance's narrow geographic definition, the severity of its impairment, and the limited significance of its social purpose. See id. at 835. "Unlike a broad rule of general conduct impacting incidentally on the leases in question, it applies exclusively and explicitly to the contractual obligations of the narrow group of lessors and lessees in the [particular] commercial district of the City, and confers a direct benefit on one class at the expense of the other." Id. She concluded that Berkeley's ordinance violated the Contract Clause. Id. at 835-36.
 
 
 121
 Similarly, the California Court of Appeals in Interstate Marina Dev. Co. v. County of Los Angeles, 155 Cal.App.3d 435, 202 Cal.Rptr. 377 (1984), distinguished a rent control ordinance that applied county-wide from a second ordinance that limited the permissible causes for terminating residential slip tenancies at the marina. Id. at 382. Both laws purportedly addressed the shortage of affordable housing in the county, id. at 381, 385, but the court found that only the rent control law served this broad purpose. "Unlike the [slip tenancy] ordinance, which aimed at giving only residential boat slip tenants the security of an indefinite term of lease, the County rent law was directed at remedying a broad social and economic problem." Id. at 385. The court found that the marina ordinance "substantially impaired" the slip tenants' leases, and it "failed to meet an important general social problem in that the group protected was small and loss of [the slip tenants'] rights would not substantially affect the housing supply of the County." Id. at 442, 202 Cal.Rptr. 377. The County did not appeal the lower court's conclusion that the marina ordinance violated the Contract Clause, id. at 442, 202 Cal.Rptr. 377, and the appeals court affirmed the lower court's determination that the general rent control ordinance did not substantially impair the leases. Id. at 449, 202 Cal.Rptr. 377.
 
 2
 
 122
 Even if the Marina Amendment satisfied a legitimate and significant government interest, it is neither reasonable nor necessary to Berkeley's stated goals. Ordinarily, we would defer to the City Council on the question of an ordinance's reasonableness and necessity, but "we are `less deferential to a state's judgment of reasonableness and necessity when a state's legislation is self-serving and impairs the obligation of its own contracts.'" Univ. of Hawaii Prof'l Assembly, 183 F.3d at 1107 (quoting Condell v. Bress, 983 F.2d 415, 418 (2d Cir.1993)). Accord U.S. Trust, 431 U.S. at 26, 97 S.Ct. 1505.
 
 
 123
 Berkeley offers several unsatisfactory explanations for the reasonableness and necessity of the Marina Amendment. The City Council declared that the privilege of using public Marina lands should not be afforded to parties exacerbating the inadequacy of worker compensation and that a portion of the revenues generated from operating a business at the Marina's unique location should be used to compensate employees. Berkeley, Cal., Ordinance 6583-N.S. (Sept. 19, 2000), § 1, A, B. However, if Berkeley wanted these contractual terms, it could have negotiated such assurances when it leased the Marina in 1968 or upon the 1996 renegotiation. Berkeley declined to do so. Berkeley also argues that the City improved the Marina area after the lease began and that these improvements justify RUI paying its workers additional compensation. When Berkeley renegotiated lease conditions in 1996, it knew the Marina location possessed special qualities, the potential for generating revenues, and what additional enhancements Berkeley would likely make to the Marina in the future. "[A]n impairment is not a reasonable one if the problem sought to be resolved by an impairment of the contract existed at the time the contractual obligation was incurred." Univ. of Hawaii Prof'l Assembly, 183 F.3d at 1107 (quoting Massachusetts Cmty Coll. v. Commonwealth, 420 Mass. 126, 649 N.E.2d 708, 713 (1995)). Having neglected to negotiate those terms, Berkeley's insistence on additional lease conditions is unreasonable.
 
 
 124
 The City expressed concern that the public's knowledge that Marina workers are not paid a living wage will deter the public from patronizing Marina businesses. Berkeley, Cal., Ordinance 6583-N.S. (Sept. 19, 2000), § 1, C. The Marina's success controverts this speculative claim. Also, Berkeley's solicitude for the sensibilities of the Marina's patrons is undermined by its failure to address the patrons of the City's other contractors who must wait for Berkeley to negotiate those contracts in the future.
 
 
 125
 Finally, Berkeley argues that higher wages will improve the quality of service provided at Marina businesses. Id. § 1, D. This assertion is, at best, conjectural. There is no evidence that Marina service does not meet ordinary industry standards; in fact, the success of the Marina businesses would suggest that the service was satisfactory. The 1968 lease already obligates RUI to "maintain adequate personnel for the efficient service of customers."
 
 
 126
 Even if the Marina Amendment's goals were appropriate, "the contract clause of the Federal Constitution limits the ability of the State, or subdivision of a State, to abridge its contractual obligations without first pursuing other alternatives." Univ. of Hawaii Prof'l Assembly, 183 F.3d at 1107 (quotations omitted). An impairment is unnecessary if "an evident and more moderate course would serve its purpose equally well." U.S. Trust, 431 U.S. at 31, 97 S.Ct. 1505. More moderate alternatives "include raising revenues through higher taxes or preserving funds through budget restrictions." S. Cal. Gas, 336 F.3d at 897. Such a showing is indeed a "heavy burden," id. at 896, because since the Supreme Court's decision in U.S. Trust, "no Ninth Circuit or Supreme Court case has found a statute or ordinance necessary when the law in question altered a financial term of an agreement to which a state entity was a party." Id. at 897 (citations omitted). In order to prevail, Berkeley must show that it cannot alleviate the financial conditions of workers through other means, such as by offering tax incentives to complying employers or by subsidizing the wages of Marina employees. This it has not done.
 
 C
 
 127
 The Marina Amendment also represents the very type of failure in the political process that the Contract Clause is designed to prevent. Energy Reserves, 459 U.S. at 412, 103 S.Ct. 697 (citing Spannaus, 438 U.S. at 247-48 & n. 20). "The principal danger addressed by the contracts clause is that the government will favor one determinate set of persons over another...." Michael W. McConnell, Contract Rights and Property Rights: A Case Study in the Relationship Between Individual Liberties and Constitutional Structure, 76 CALIF. L. REV. 267, 289 (1988). The Supreme Court long ago cautioned that when a government burdens a numerically small class, it may distort the democratic process. Where a rule of conduct applies to more than a few people, the people are "equally concerned," and the matter is especially well-suited for legislative action. Bi-Metallic Investment Co. v. State Board of Equalization, 239 U.S. 441, 445, 36 S.Ct. 141, 60 L.Ed. 372 (1915). But where, as here, "[a] relatively small number of persons [are] concerned," id. at 446, 36 S.Ct. 141, a danger exists that the legislature acted less out of concern for the general good than for special interests or even its own interests. This risk is heightened when the legislation is given retroactive effect because a retroactive statute "may be passed with an exact knowledge of who will benefit from it." Charles B. Hochman, The Supreme Court and the Constitutionality of Retroactive Legislation, 73 Harv. L.Rev. 692, 693 (1960) (quoted in Landgraf, 511 U.S. at 267 n. 20, 114 S.Ct. 1483). The Supreme Court counseled that we must examine Contract Clause challenges for "circumstantial evidence" that "a small number ... were singled out from [a] larger group" and search for "any indication that the ... political process ha [s] broken down." Energy Reserves, 459 U.S. at 417, 103 S.Ct. 697.
 
 
 128
 The Marina Amendment bears all of the hallmarks of special interest legislation. The original LWO applies to future city contracts and to existing contracts as they come up for renewal. The original LWO therefore covers RUI's lease when it comes due for renewal. Within a month of the passage of the LWO, Local 2850 urged the Mayor and City Council to make the LWO retroactive to the Marina's employers. It sent faxes to the Council members and mentioned specific employers. Appellee Local 2850 frankly confessed in its brief that Berkeley "used geographic location ... as a proxy for ability to pay," and it acknowledged that other Berkeley employers could not afford to pay the living wage. These facts strongly suggest that Berkeley aimed the Marina Amendment at particular employers and meant to benefit particular parties.
 
 
 129
 Even more importantly, the Marina Amendment advances the City's own financial self-interest. The City may benefit in two ways. First, to the extent that the Marina Amendment raises workers' wages to a living wage, it reduces their dependence on public assistance programs. The Marina Amendment thus shifts the burden of public assistance programs from the City to RUI and its customers. Berkeley is relieved of the responsibility for the worker's public assistance and those funds are freed for other public purposes. The Marina Amendment operates similarly to an unfunded mandate because it accomplishes the City's goals through off-budget means.[14] Cf. Printz v. United States, 521 U.S. 898, 930, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997) ("By forcing state governments to absorb the financial burden of implementing a federal regulatory program, Members of Congress can take credit for `solving' problems without having to ask their constituents to pay for the solutions with higher federal taxes"); id. at 957-58 (Stevens, J., dissenting) (suggesting that such actions represent a failure of "political safeguards").
 
 
 130
 Second, depending on RUI's elasticity of demand, RUI's gross receipts may go up under the Marina Amendment. If RUI raises its prices and its gross receipts increase, the amount of rent that RUI pays will increase as well because the lease defines the amount of rent as a fixed percentage of its gross receipts. In sum, the Marina Amendment may actually generate revenues for the City's coffers — at little or no political cost to Berkeley's elected officials.
 
 
 131
 Regrettably, the majority's failure to recognize this Contract Clause violation has significant implications for employees far from Berkeley's Marina. Under the majority's holding, contractual silence authorizes a municipality to impose additional terms on particular contracting parties — so long as the municipality cloaks the additional requirements in the form of a legislative enactment. Even more than the obvious unfairness of such unfettered license, it erodes democratic accountability by allowing governments to foist the costs of special interest legislation onto politically weak groups. See Bi-Metallic, 239 U.S. at 445-46, 36 S.Ct. 141. As described earlier, the Contract Clause has most often protected public employees from the opportunism of financially-strapped state and local governments. See supra at nn. 8-9. The majority's opinion provides financially troubled governments with the license to extract more stringent terms from public employees whose collective bargaining agreements necessarily lack express terms on every aspect of the employment relationship. Such a result can hardly be categorized as aiding "the plight of its own working poor." Maj. op. at 1141.
 
 III.
 
 132
 Berkeley's Marina Amendment substantially impairs RUI's lease, unnecessarily and unreasonably, without advancing a broad social purpose. I would hold that it violates the Contract Clause. I respectfully dissent.
 
 
 
 Notes:
 
 
 [1]
 Because I would find that Berkeley has violated the Contract Clause, I do not reach RUI's equal protection and non-delegation claims
 
 
 [2]
 As the majority opinion notes, Maj. op. at 1142-43, Santa Monica attempted to enforce a living wage ordinance on private employers, whether they had a public contract or not, and the voters repealed the ordinance by referendum
 
 
 [3]
 These amounts represent a 69.6% increase for workers who had health benefits and previously received California's then-prevailing minimum wage, and a 97.7% increase for workers who had no health benefits and previously received California's minimum wage of $5.75. Cal.Code Regs., tit. 8, § 11000(2)
 
 
 [4]
 RUI's lease does address other employer-employee issues. Paragraph 27 requires, for example, that RUI comply with Berkeley's non-discrimination policies
 
 
 [5]
 See S. Cal. Gas, 336 F.3d at 892-93 (Santa Ana "trench cut" ordinance impaired 1938 agreement regarding utility companies payment for excavation); Univ. of Hawaii Prof'l Assembly, 183 F.3d at 1104-06 (Hawaii "pay lag" decision impaired implied payroll dates in public employees' collective bargaining agreement); State of Nevada Employees Ass'n v. Keating, 903 F.2d 1223, 1227 (9th Cir.1990) (statute impaired the right of public employees to withdraw their personal contributions); Air Cal, Inc. v. City & County of San Francisco, 865 F.2d 1112, 1116 (9th Cir.1989) (ordinance requiring 19 airlines to pay "prevailing rate of pay" at the airport impaired their leases with the city); Cont'l Illinois Nat'l Bank & Trust Co. v. Washington, 696 F.2d 692, 697-701 (9th Cir.1983), appeal dismissed sub nom., The Don't Bankrupt Washington Comm. v. Cont'l Illinois Nat'l Bank & Trust Co., 460 U.S. 1077, 103 S.Ct. 1762, 76 L.Ed.2d 338 (1983) (Washington voter initiative imposing bond restrictions impaired state contracts with public utility); Sonoma County Org. of Public Employees, 152 Cal.Rptr. 903, 591 P.2d at 4 (statute prohibiting paying salary or cost-of-living increases impaired memorandum of understanding with public employees); Interstate Marina Dev. Co. v. County of Los Angeles, 155 Cal.App.3d 435, 202 Cal.Rptr. 377, 381-82 (1984) (ordinance prohibiting termination of marina leases except for specified causes impaired leases). See also Associated Builders & Contractors v. Baca, 769 F.Supp. 1537, 1549 (N.D.Cal.1991), aff'd on other grounds sub nom. Chamber of Commerce of the United States v. Bragdon, 64 F.3d 497, 502 (9th Cir.1995) ("prevailing wage" ordinance impaired private collective bargaining agreement); Ross v. City of Berkeley, 655 F.Supp. 820, 828-29 (N.D.Cal.1987) (commercial rent control ordinance impaired existing private leases).
 
 
 [6]
 The majority states that "the rent provision, calculating rent as a percentage of gross revenues,before labor costs are deducted, is not affected by increased wage and benefit costs." Maj. op. at 1148. This is true in the technical sense that Berkeley receives a fixed percentage of RUI's gross receipts, and the Marina Amendment does not affect the percentage owed. To the extent the majority is implying that Berkeley's rent (as a dollar amount) will not increase as a result of the Marina Amendment, this may not be true, as I discuss post, at 1172-73.
 
 
 [7]
 See John E. Nowak & Ronald D. Rotunda, 2 TREATISE ON CONSTITUTIONAL LAW 636 (3d ed. 1999) ("During the Marshall years the Court used the provision to invalidate statutes that retroactively impaired almost any contractual obligation of private parties. The Court never used the clause to void laws that prospectively modified contractual obligations."); Michael B. Rappaport, Note, A Procedural Approach to the Contract Clause, 93 YALE L.J. 918, 925 (1983) (noting that substantive due process was applied to prospective legislation and arguing the Contract Clause applies only to retrospective legislation). See also Douglas W. Kmiec & John O. McGinnis, The Contract Clause: A Return to the Original Understanding, 14 HASTINGS CONST. L.Q. 525, 553 (1987) (distinguishing Contract Clause and substantive due process).
 
 
 [8]
 See, e.g., Bd. of Admin. v. Wilson, 52 Cal.App.4th 1109, 1153-57, 61 Cal.Rptr.2d 207 (1997); United Firefighters of Los Angeles City v. City of Los Angeles, 210 Cal.App.3d 1095, 1109-1117, 259 Cal.Rptr. 65 (1989); California Teachers Ass'n v. Cory, 155 Cal.App.3d 494, 510-13, 202 Cal.Rptr. 611 (1984); Valdes v. Cory, 139 Cal.App.3d 773, 789-91, 189 Cal.Rptr. 212 (1983).
 
 
 [9]
 Ass'n of Surrogates & Supreme Court Reporters v. New York, 940 F.2d 766, 773-74 (2d Cir.1991), modified at 969 F.2d 1416 (1992); Andrews v. Anne Arundel County, 931 F.Supp. 1255, 1264-67 (D.Md.1996); Fraternal Order of Police v. District of Columbia, 1995 U.S. Dist. LEXIS 20951 at 20-42 (D.D.C.1995); Marvel v. Dannemann, 490 F.Supp. 170, 175-77 (D.De.1980); Christensen v. Minneapolis Municipal Employees Ret. Bd., 331 N.W.2d 740, 750-52 (Minn.1983); Carmichael v. Workers' Comp. Court, 234 Mont. 410, 414-15, 763 P.2d 1122 (1988); Opinion of the Justices, 135 N.H. 625, 630-38, 609 A.2d 1204 (1992); Cliff v. Blydenberg, 173 Misc.2d 366, 661 N.Y.S.2d 736, 739-40 (1997); Oregon State Police Officers' Ass'n v. State, 323 Ore. 356, 375-76, 918 P.2d 765 (1996).
 
 
 [10]
 At oral argument, Appellant's counsel agreed that if the living wage had been immediately and generally applicable throughout the city, RUI would have no claim. The majority mistakenly contends that this common-sense statement is a concession of RUI's position. Maj. op. at 1153-54
 
 
 [11]
 The majority unconvincingly attempts to elide these differences by characterizing them as the manner in which Berkeley exercises its authority. Maj. op. at 1154. However, the majority cites no authority to support this proposition
 
 
 [12]
 The smallness of the burdened class results from the narrow geographic scope of the Marina Amendment. According to one living wage advocacy group, Berkeley's Marina Amendment was "the first area-based living wage policy in the nation." Living Wage Resource Center,Living Wage Successes: A Compilation of Living Wage Policies on the Books, available at http://www.livingwagecampaign.org/victories.php (last visited May 25, 2004). The only other location-based living wage policy is Jack London Square at the Port of Oakland. Unlike Berkeley's Marina Amendment, however, the Port of Oakland's location-based living wage ordinance applies only prospectively to contracts entered into after the provision's effective date. It reaches existing agreements only when they are "amended to benefit the business." Port of Oakland, Living Wage Frequently Asked Questions, available at http://www.portofoakland.com/ portnyou/livingwa.asp (last visited May 25, 2004).
 The City of Santa Monica, California, passed a living wage provision that applied to the coastal tourist district. Voters repealed it by referendum in November 2002. Andrew Fixmer, Hotly Debated Measure Defeated, SANTA MONICA DAILY PRESS , Nov. 6, 2002, at 1.
 
 
 [13]
 Berkeley's expert estimates that approximately 350 employees work for the Marina lessees and that at least half of them earn less than the living wage. The record does not show how many of these 175 employees work for the Radisson or HS Lordships, both of which are exempted from the LWO because they have collective bargaining agreements
 
 
 [14]
 The LWO accomplishes a similar purpose, of course, but its mandate is prospective and conditioned on private parties entering into contracts with the City